[No. S054489. Jan. 5, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
KEITH ZON DOOLIN, Defendant and Appellant.

## Counsel

Robert Derham, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Eric Christoffersen and Lloyd G. Carter, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**CORRIGAN, J.**—A jury convicted defendant Keith Zon Doolin of the first degree murders[1] of Inez Espinoza and Peggy Tucker, and the attempted murders[2] of Alice Alva, Debbie Cruz, Marlene Mendibles, and Stephanie Kachman. For each crime, the jury found that defendant personally used a

---

[1] Penal Code section 187. Statutory references are to the Penal Code unless otherwise indicated.

[2] Sections 187 and 664.

firearm.[3] For each attempted murder, the jury found defendant personally inflicted great bodily injury on the victim.[4] The jury found true the special circumstance allegation of multiple murder,[5] and returned a verdict of death.

The court denied defendant's motions for a new trial[6] and penalty modification[7] and sentenced defendant to death. The court imposed and stayed a determinate sentence on the noncapital felony counts and enhancements.

This appeal is automatic.[8] We affirm the judgment in full.

## I. FACTS AND PROCEEDINGS

### A. *Guilt Phase*

#### 1. *Overview of Prosecution's Case*

Between November 2, 1994, and September 19, 1995, defendant murdered two Fresno prostitutes and attempted to murder four others. At trial, each surviving victim identified defendant as her assailant. One decedent's boyfriend saw her enter a car defendant was driving on the night she was murdered. Ballistics evidence established defendant's Firestar .45-caliber handgun was used to kill Espinoza and Tucker. Shell casings found at the Espinoza and Kachman crime scenes were fired from that same weapon. Defendant's sister lived with him during the time the shootings occurred. Her Lorcin .25-caliber pistol "probably" fired the shell casings found at the Alva crime scene. Tire impressions left at the Mendibles and Espinoza crime scenes were similar to the tread on defendant's truck tires.

Incriminating statements and other evidence linked defendant to the crimes.

The defense consisted of evidence of alibi, mistaken identification, and third party culpability.

A summary of the evidence adduced at trial follows.

---

[3] Section 12022.5, subdivision (a).
[4] Section 12022.7.
[5] Section 190.2, subdivision (a)(3).
[6] Section 1181.
[7] Section 190.4, subdivision (e).
[8] Section 1239, Subdivision (b).

### a. *The Two Murders and Four Attempted Murders*

#### (1) *Attempted murder of Alice Alva*

On the night of November 2, 1994, Alice Alva was working as a prostitute. Defendant pulled up next to her in his pickup truck and offered her $30 for sex. Alva got into the truck, and defendant drove to a nearby cul-de-sac. When Alva asked for payment, defendant pointed a silver gun at her and said, "I'm going to fuck you all night." Frightened, Alva told him, "I'll do whatever you want, but before we have sex, I need to use the bathroom." Defendant agreed, but warned Alva, "Don't try anything stupid because you won't be the first girl I shot and killed." Alva left the truck and ran. She heard three or four shots, was shot in the leg, and fell to the pavement. When she saw defendant approach with the gun in his hand, she pretended to be dead. Defendant got in the truck and sped off.

The police recovered three .25-caliber shell casings in the roadway near where Alva had fallen. Dr. Ralph Koo treated Alva, who had a bullet lodged in her fractured right tibia. Because of the risk of complications, including paralysis, Dr. Koo did not remove the bullet.

#### (2) *Attempted murder of Debbie Cruz*

Around midnight on December 29, 1994, Debbie Cruz was working as a prostitute when defendant picked her up in his truck and drove to an alley. As Cruz began to undress, defendant said, "I guess you're waiting for money." He then pulled a small silver gun from his pocket and shot her. Cruz opened the passenger door, fell out, and crawled away. She collapsed at a nearby house and a resident called police.

Officer Jack Gordon responded. Based on the size of Cruz's wound, Gordon believed she had been shot by a small caliber gun, possibly a .22. A treating physician determined the bullet entered Cruz's left hip, passed through her abdomen, and perforated her small intestine. The bullet was left in place following emergency surgery.

#### (3) *Attempted murder of Marlene Mendibles*

Around 1:00 a.m. on July 29, 1995, Marlene Mendibles was working as a prostitute and accepted defendant's offer of a ride in his truck. Defendant drove for a while, pulled over, and ordered her to disrobe, threatening to shoot her if she did not comply. When defendant pulled out a large silver gun, Mendibles grabbed her bag, opened the passenger door, and told him she would walk. Standing beside the truck, Mendibles told defendant, "I bet you

remember me," and he replied, "I bet you remember me, too." She then heard a "pop." Defendant drove away and Mendibles fell to the ground. She was rendered a paraplegic by the shooting.

### (4) *Murder of Inez Espinoza*

At 4:20 a.m., the same morning of the Mendibles shooting, Alice Trippel heard a gunshot. At 4:30 a.m., Carmen Ramos, who lived nearby, heard screaming. Around 11:00 a.m., Ramos's daughter drove to her mother's home. As she approached the carport, she saw the dead body of prostitute Inez Espinoza in an alley near the home.

Detective Robert Schiotis examined Espinoza's body and saw a gunshot entry wound in her lower right back with an exit wound several inches below her navel. He removed a large caliber bullet and a piece of the copper casing from Espinoza's clothing. He also recovered a spent .45-caliber shell casing, a condom, and a torn Trojan brand condom wrapper. He also noted tire tracks and "traction marks of a car taking off in a hurry."

The autopsy surgeon observed a gunshot wound above Espinoza's right hip. The presence of powder marks near the entry wound indicated the gun had been pressed against her clothing when fired. The bullet had severed a major artery. She died from internal bleeding.

### (5) *Attempted murder of Stephanie Kachman*

On August 11, 1995, about 3:00 a.m., defendant drove up beside Stephanie Kachman in a small white truck. She agreed to have sex and got in the truck. Defendant drove into an alley and stopped. When Kachman asked to be paid, he pointed a gun at her head and told her to take off her clothes. Kachman told defendant she needed to get out of the truck because a leg injury made undressing difficult. They both left the truck.

While Kachman undressed, defendant put on a condom and placed his gun on the truck seat. They began to have intercourse, but Kachman lost her balance and stumbled. As she ran out of the alley, she heard defendant's truck approaching. She looked back and saw defendant shooting at her through his window. Kachman was hit twice and fell to the ground. A nearby resident summoned the police.

Seven shell casings were recovered near the scene. Kachman sustained two through and through bullet wounds, one in her back and the other in one of her thoracic vertebrae.

### (6) Murder of Peggy Tucker

On the night of September 18, 1995, Peggy Tucker and Rick Arreola left their motel and walked to an area in West Fresno. Tucker walked ahead with Arreola trailing at a distance.

Arreola saw a Lincoln Town Car drive up next to Tucker, who spoke to the driver and then got into the front passenger seat. Arreola watched as the car drove into an empty lot and out of his sight.

As Arreola stood on the center divider waiting for Tucker to return, he saw the Lincoln drive by. The car's dome light was turned on and the driver, whom Arreola identified as defendant, appeared be alone.

On the following morning, Tucker's body was found in an alley. When told of Tucker's death, Arreola spoke with police and described the Lincoln Town Car by color and license plate number. Defendant's mother, Donna Doolin Larsen, owned a similar vehicle.

Tire tracks at the Tucker murder scene reflected an "acceleration mark" indicating the vehicle left at high speed. Two packages of condoms were recovered from Tucker's right hand. There was blood on her back, in her mouth, and on the ground nearby.

Tucker's autopsy revealed that she had been shot in the right hip. The gun was probably fired from two to four inches from the body based on stippling and soot marks. The perforation of two major blood vessels and the intestines caused fatal blood loss and shock. Three bullet fragments were recovered from the body.

### b. Defendant's Arrest and Statements to Police

### (1) First police interview

On October 18, 1995, defendant was arrested and read his *Miranda*[9] rights. Defendant said he understood them and was taken to police headquarters. There, Detectives Robert Schiotis and Albert Murrietta again explained defendant's *Miranda* rights, which he waived.

Defendant told the detectives he was a trucker and recently had been working for a towing company and a recycling center. He reported he had been a civilian employee of the Army, Navy, and Marines.

---

[9] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

Defendant admitting owning a 1984 Toyota pickup. He initially denied knowing about the prostitute shootings, but then conceded he had heard that prostitutes were being robbed and shot.

The detectives said they knew defendant owned a gun and that one of the victims had identified him as her assailant. Defendant said he owned a .45-caliber Firestar Compact, which was in his house. It was his "personal gun," which he alone used. He bought the Firestar for protection because it "shoots with both hands," and he was ambidextrous. He had fired the gun about 150 times at an indoor shooting range but did not carry it.

Defendant had previously owned and sold two rifles. In his safe, he occasionally kept guns belonging to friends. Currently his safe contained a .44-caliber automatic and possibly a nine-millimeter Taurus. When asked about a bulletproof vest found in his house, defendant said he bought it for protection because he had been robbed at a Walgreens store two years earlier and while clerking at a 7-Eleven store.

When informed of the charges against him, defendant claimed he was innocent and asked what he could do to vindicate himself. He told the detectives he did not leave the house at night, except to go to the store to get away from "tension at home." He admitted that a friend of his knew prostitutes. He had seen prostitutes near a tavern and near the 7-Eleven store where he had worked. He denied ever having hired a prostitute, although one had approached him once. He felt Fresno was "flooded" with prostitutes and believed prostitution should be legalized.

When told a witness had watched him pick up Peggy Tucker in the Lincoln Town Car the night she was murdered, defendant replied, "I have not picked up a prostitute in the car." Defendant had heard on television that the suspect drove a white truck with red letters on the tailgate and a larger "Cadillac-type vehicle." Told that the tire track evidence implicated him, defendant responded that he had put new tires on the Lincoln about two weeks earlier and on his truck in May 1995.

He could not explain why the surviving victims identified him from a photo lineup. He denied shooting them, using drugs, or drinking alcohol. Asked when he last had sex, defendant paused a long time, and then replied, "That doesn't count." He explained he had had oral sex with a woman three weeks earlier and paused because he did not know if oral sex "counted for having sex with a girl." Defendant maintained his innocence and again asked what he could do to vindicate himself. The interview was concluded, and defendant agreed to talk with detectives again.

### (2) *Second police interview*

Detective Schiotis reinterviewed defendant later that day. Schiotis said a search of defendant's house revealed the box for a second .45-caliber Firestar. This second Firestar would later be proven to have been used in several of the incidents. Asked why he had not disclosed the existence of the second Firestar, defendant said, "it just didn't come up when we were talking," and claimed the second gun "hardly ever had been used." Defendant initially said that the second Firestar was in the headboard of his bed, and then that he had given the gun to his cousin, Bill Moses, about three weeks earlier. Upon further questioning, defendant told the detectives his sister, Shana Doolin, had a .25-caliber handgun.

### (3) *Third police interview*

The next day, defendant was questioned after again hearing and waiving his *Miranda* rights. He reported that he had loaned the second Firestar to Bill Moses three or four weeks earlier, and that no one else had used his gun. When told another victim had identified him as her assailant, defendant looked at the photo lineup and commented that one of the suspects looked "close enough to be his brother." He also said, "We're going in circles here."

### c. *Search of Defendant's Home and Inspection of Defendant's Truck*

Defendant's home was searched on the day of his arrest. Police found a videotape entitled Pro Sniper, which showed firing positions and types of guns used by a sniper. They also found photographs of defendant and others with guns. In defendant's bedroom, they found body armor, a bulletproof vest with FBI stenciled on the back, three ski masks, black military clothing, a camouflage shirt, *Soldier of Fortune* and *Combat Arms* magazines, some pornographic magazines, information on mail-order brides, and two boxes of .45-caliber ammunition. A fully loaded .45-caliber Firestar in a black waist holster, a loaded magazine, and a radio scanner were found in the living room.

A gun safe in the garage held a Taurus PT-99 nine-millimeter handgun, three magazines for that weapon, two empty Firestar gun boxes with consecutive serial numbers, and two sets of handcuffs. The safe also contained a metal belt buckle with an opening for a .22-caliber handgun; an Omega Taser; paperwork showing purchases of, and repairs to, guns owned by defendant; an unloaded .44-magnum handgun; three plastic starter guns; a variety of rifles and shotguns; and several kinds of ammunition, including over 600 .22-caliber rounds. Three unopened condoms were recovered from the ashtray in defendant's truck.

d. *Further Investigation*

Detective Frank Rose recovered an unloaded .45-caliber Firestar, two empty magazines, and a nylon holster from Bill Moses. Moses said that he got the gun from defendant two or three weeks earlier, but he had not fired the weapon.

Detective Todd Fraizer retrieved a Lorcin .25-caliber semiautomatic handgun from Shana Doolin at her residence in Stockton.

e. *Defendant's Purchase of the Firestar Handguns and Accessories*

On March 19, 1995, following the mandatory 15-day waiting period, defendant had picked up the two Firestar .45-caliber handguns he had purchased. The registered serial numbers were the same as the numbers on the boxes found at his home. Defendant also purchased two holsters that could be worn inside pants and two magazines that allowed for one additional bullet in each magazine. The store owner testified the Firestar had only been on the market a few months and "would carry the greatest power—most powerful bullet for its size." He said that handgun was designed to be concealable. He also identified bullets seized from defendant's residence as containing Federal brand .45-automatic hydroshock hollowpoint cartridges, designed to expand upon impact.

f. *Testimony of Defendant's Sister, Shana Doolin*

Defendant's sister, Shana Doolin, testified that she, her mother, and her stepfather were living with defendant when the shootings occurred. She bought the Lorcin .25-caliber handgun retrieved by police. It jammed occasionally.

Shana gave her gun to defendant in mid-July 1995 because he said "one of our relatives needed it." She claimed at trial that defendant returned the gun to her in mid-August 1995. She admitted that she testified at defendant's preliminary hearing that he returned the gun in early September 1995.

g. *Ballistics Evidence*

Before defendant was arrested, Criminalist Stephen O'Clair examined a .45-caliber shell casing found near Espinoza's body and seven shell casings found at the Kachman crime scene. He concluded they were all fired from the same gun. O'Clair also concluded these shell casings "most likely" contained Federal brand hydroshock hollowpoint bullets.

O'Clair later compared bullets test fired from the .45-caliber Firestar retrieved from Bill Moses (the second Firestar) with rounds recovered from the Espinoza crime scene and Tucker's body. Both bullets were fired from the second Firestar that defendant initially failed to mention to the detectives. O'Clair determined these bullets were "probably" Federal brand hydroshock hollowpoint bullets.

O'Clair also test fired Shana Doolin's .25-caliber Lorcin and compared the characteristics of the spent shell casings with the shell casings found at the Alva crime scene. He concluded the casings recovered from the Alva scene were "probably" fired from that gun. O'Clair explained that a defect in the Lorcin left "gross types of marks" rather than "finer striated marks" on spent casings. This defect precluded a positive match of the shell casings.

Criminalist Charles Morton also examined Shana Doolin's Lorcin and the second Firestar. He test fired each and compared bullets and shell casings from those weapons with those found at the Espinoza, Kachman, and Alva scenes and the bullet recovered from Tucker's body. Morton concluded the shell casings found at the Espinoza and Kachman scenes were fired by the second Firestar. The Espinoza and Tucker bullets were also fired from that gun.

Morton agreed with O'Clair that a .25-caliber weapon like Shana Doolin's was used in the Alva shooting. He explained that the number of guns that could have been used in this shooting "probably" could be reduced based on irregularities he observed on the Alva scene shell casings that were caused by imperfections on the breech face of the gun that fired those casings.

h. *Tire Tread Evidence*

O'Clair examined, made impressions, and created photographic transparencies of the tires on defendant's truck. He compared these transparencies with actual size photographs of the tire tracks found at the Mendibles and Espinoza crime scenes. Except for differences in tread wear that could have resulted from the passage of time, the tire impressions from both crime scenes were similar to the tread on both front tires and the right rear tire on defendant's truck. The left rear tire of defendant's truck had a different tread design and appeared to be newer than the other three tires.

O'Clair examined what he described as "fairly new tires" on the Lincoln belonging to defendant's mother. The tread on these tires did not match the tire impressions found at the Tucker murder scene.

## 2. The Defense Case

### a. Defendant's Testimony

Defendant testified he did not know the two decedents and first saw the surviving victims when they appeared in court. He claimed that when the Alva and Cruz assaults occurred, he was in Watsonville and Wasco, respectively.

On the night of the Mendibles and Espinoza shootings, defendant helped his family pack for an upcoming move. Around 2:45 or 3:00 a.m., he drove to David Daggs's house to unload two motorcycles. He left around 4:30 a.m. and returned home about an hour later after stopping at a gas station. Daggs began his newspaper delivery route around 4:30 a.m. Defendant could not explain why his mother wrote in her journal that he left the house that morning around 2:00 a.m.

On the night of August 10, 1995, through the early morning hours of August 11, 1995, when Kachman was shot, defendant was at home with his mother and cleaned the house in anticipation of listing it for sale.

During the night of the Tucker murder, he was at his mother's house. He did not "remember ever going out or doing anything special." He confirmed his mother's Lincoln was at that residence.

He described himself as a gun collector who used ammunition of different types, including hollowpoints. He described the latter as "made to expand, double its size" upon impact and more accurate than "a full metal projectile" at short ranges.

Defendant denied watching the Pro Sniper video found at his home. He bought matching .45-caliber Firestar handguns because he is ambidextrous. He could not explain what had happened to 18 hydroshock hollowpoint bullets missing from a box of Federal brand bullets found at his home. He suggested his cousin Bill Moses might be responsible for the shootings but acknowledged that there are "still a lot of unanswered questions, of course, . . . some that are positive and some that are negative" about Moses's possible involvement.

### b. Defense Psychiatrist Dr. Howard Terrell

Dr. Howard Terrell, a psychiatrist, testified that defense counsel initially had asked him to evaluate defendant and review the police reports. Dr. Terrell concluded, "I found a man who showed no evidence that I could see of

mental disorder, either in my examination of him or my review of the [police reports] that I have available." The psychiatrist found no evidence of psychosis, manic depression, drug addiction, personality disorders, or sadism. Dr. Terrell had evaluated over 100 murderers and probably a dozen serial killers during his career. In his opinion, defendant did not match any of the "typical profiles"[10] he would expect to see in a murderer, "let alone a serial killer."

c. *Alibi Witnesses*

James Bacon testified that he had known defendant since 1985 or 1986. On November 2, 1994, the night of the Alva assault, defendant was visiting him in Freedom, California. Bacon was not certain but thought defendant left for Fresno on Friday, November 5, 1994. Defendant also stayed with Bacon in late July 1995, and returned to Fresno on the afternoon of July 28, 1995, with two motorcycles in his truck.

On cross-examination, Bacon admitted he attended the preliminary hearing, listened to witnesses testify, and took notes. Bacon had compared these notes with those taken by defendant's sister, Shana Doolin. He had also looked at notes taken by defendant's mother.

David Daggs testified that from December 1994 to September 1995, he dated Shana Doolin. Around 3:30 a.m. on July 29, 1995,[11] the morning of the Mendibles and Espinoza shootings, defendant came to his residence and unloaded motorcycles from his truck. Defendant finished before Daggs began his newspaper route at 5:00 a.m. According to Daggs, Shana told him that defendant had purchased the Lorcin for her.

Defendant's mother, Donna Doolin Larsen, testified that defendant watched television in his bedroom the night of the Kachman shooting, and did not leave the house. On cross-examination, when pressed on whether she actually remembered him being at home that evening, Larsen said, "I know he was. I will go to my death saying that he was at home on that date."

Regarding the night of the Tucker murder, Larsen testified defendant was home and left once from about 11:00 p.m. to 11:30 p.m. to buy her ice cream, cleaning supplies, and gasoline. She and defendant cleaned her house "for hours" that night, to prepare for a real estate showing.

---

[10] The "typical profiles" of murderers that Dr. Terrell considered in his evaluation of defendant are described in more detail in part II.C.1., below.

[11] During his police interview, Daggs said defendant came to his house at either 4:00 a.m. or 7:00 a.m., but he could not remember which time.

On cross-examination, Larsen invoked her Fifth Amendment privilege against self-incrimination when asked several questions about her character for honesty and whether she had ever falsely represented herself as a registered nurse or submitted false documents at her place of employment.

Bill Moses testified he received the second Firestar from defendant on September 1, 1995. He remembered the date because it was his father's birthday and he helped pack Shana Doolin's moving truck that evening. Moses stated he was mistaken when he told Detective Rose that he had gotten the gun during the last week of September or the first week of October 1995. He explained he had been suffering from the side effects of a chemotherapy drug that can cause amnesia.

Defendant unloaded hollowpoint bullets from the gun before giving it to Moses, who owned three handguns himself. He acknowledged that Tucker was murdered on September 19, 1995, and said he understood the implications of his claim that he had defendant's gun on that date.

Moses further testified that he and defendant once took Shana Doolin's Lorcin without her knowledge. He had borrowed this handgun from defendant from the end of July 1995 until August 18, 1995.[12]

### 3. Prosecution's Rebuttal Witnesses

The prosecution presented numerous rebuttal witnesses whose testimony is discussed in part II.C.2., below.

### B. Penalty Phase

### 1. The Prosecution Case

Dana Peterson, a registered nurse, assisted in a sexual assault examination of D. on November 3, 1992. D. had a fresh bruise on her right lower leg, which she claimed she had sustained in a struggle with defendant.[13]

Criminalist John Hamman testified as a ballistics expert. Hamman stated a hollowpoint bullet is designed to "mushroom or expand" upon impact and make almost twice as large a "wound track" through the body, causing more damage.

---

[12] Michelle Moses, Bill Moses's wife, testified they borrowed Shana's gun from the first week of July 1995 until August 18, 1995.

[13] In anticipation of this evidence, David Daggs had testified for the defense during the guilt phase that his sister D. had been "very untruthful" in the past and that he had difficulty believing her rape allegation.

Angel C., the 16-year-old daughter of murder victim Inez Espinoza, testified she and her two half brothers (ages nine and six) and a half sister (age three) all missed their mother. She testified that in losing her mother, she lost "a big part of my life."

Nina Mandrell, the sister of murder victim Peggy Tucker, testified Tucker was survived by her mother, two sisters, a brother, a husband, and two children ages five and three. She and Tucker were very close. Tucker's murder had been devastating to her.

### 2. The Defense Case

Allan Hedberg, a clinical psychologist, interviewed and tested defendant for eight and a half hours the week before the penalty phase began. Dr. Hedberg found defendant did not fit the profile of a person who is psychotic, mentally ill, psychopathic, or sociopathic. He described defendant as a "little paranoid" and having "some unresolved resentment from his childhood that he has not worked out," causing him feelings of sadness, mild depression, anxiety, or hostility. Dr. Hedberg also found defendant to be a person "who has difficulty dealing with conflict, dealing with threat, dealing with anger, dealing with feelings of resentment and wants to be seen as favorable by other people, wants to be accepted by other people. . . ."

Dr. Hedberg stated that defendant's mother had been married four times and that defendant, who suffered from a learning disability, had been verbally and emotionally abused by two of his stepfathers.

Based on his observations, Dr. Hedberg said defendant appeared to have "adjusted quite well" to the jail environment, interacting positively with guards and inmates.

## II. GUILT PHASE ISSUES

### A. Alleged Conflict of Interest Based on Counsel's Compensation Agreement

"Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." (*Strickland v. Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*).) Fundamental to counsel's role is "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." (*Id.* at p. 691.)

In this case, defendant contends Fresno County Superior Court's compensation agreement created an inherent and irreconcilable conflict of interest because both counsel's compensation and the costs for investigative and expert services were covered by a lump sum fee. Defendant asserts this circumstance created a financial disincentive for counsel to adequately investigate and prepare his case. Any such agreement, he argues, creates a conflict requiring reversal under the judicially declared rule of *People v. Barboza* (1981) 29 Cal.3d 375 [173 Cal.Rptr. 458, 627 P.2d 188] (*Barboza*).

In the alternative, defendant contends the fee agreement violated his state and federal constitutional rights to conflict-free counsel as well as his federal constitutional rights to equal protection, due process, and a reliable verdict. Each of defendant's contentions is without merit.

### 1. *The Terms of Counsel's Compensation Agreement*

At the time of defendant's trial, Fresno County Superior Court's policies for capital cases provided for three categories of compensation depending on the complexity of the case.[14] Appointed counsel were paid a lump sum, as follows: $40,000 for a noncomplex case with one defendant and one victim; $60,000 for a case involving multiple victims or defendants, complicated special circumstances, or complex factual or legal issues; and $80,000 for a case involving multiple victims or defendants, highly unusual publicity, complicated special circumstances, or complex factual or legal issues (Category 3 cases). The lump sum amount covered all attorney fees as well as costs for ancillary services under section 987.9.[15] Under these agreements, appointed counsel received periodic payments throughout the pendency of the

---

[14] We have granted defendant's unopposed motion for judicial notice filed on October 15, 2007, and have taken judicial notice of the following Fresno County Superior Court documents: (1) a one-page memorandum entitled "Revised Special Circumstance Case Policy" dated December 8, 2003, and (2) a 20-page document entitled "Policy on Special Circumstance Case Appointments Effective January 1, 2004." (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) In addition, at respondent's request, we have taken judicial notice of the following Fresno County Superior Court policy documents on capital case compensation: (1) a three-page letter memorandum dated August 4, 1994, from Fresno County Superior Court addressed to "All Criminal Defense Attorneys," providing "Notice of Adoption of a Joint Court Policy on Capital Case Appointments," (2) a 15-page document entitled "Fresno County Superior Court/Consolidated Fresno Municipal Court/Central Valley Municipal Court Joint Policy on Capital Case Appointments" with attached appendices A through E, and (3) a one-page letter dated April 14, 1995, from the Court Executive Officer of Fresno County Superior Court to the "Capital Case Review Committee" regarding attachment appendix F (statutes of limitations form waiver) to the policy documents. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

[15] At the time of defendant's trial, section 987.9 provided, in relevant part: "In the trial of a capital case or a case under subdivision (a) of Section 190.05 the indigent defendant, through the defendant's counsel, may request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense. The application for funds shall be by affidavit and shall specify that the funds are reasonably

case.[16] Upon written justification, appointed counsel could obtain additional "Category fees" for cases that received extensive publicity or that involved numerous victims or crimes. As the case progressed, appointed counsel could request additional funding for expenditures under section 987.9. The agreement here provided that investigative and expert costs were included in the authorized Category 3 compensation of $80,000, unless additional amounts were authorized by the Capital Case Review Committee. Thus, the agreement provided for the express authorization of increased expenditures.[17]

Based on the record, it appears the capital case compensation system operated in the following way. Upon appointment, private counsel would make an initial evaluation of the case by rating its complexity and projecting the kind and extent of ancillary services that might be required. Based on this

---

necessary for the preparation or presentation of the defense. The fact that an application has been made shall be confidential and the contents of the application shall be confidential. Upon receipt of an application, a judge of the court, other than the trial judge presiding over the case in question, shall rule on the reasonableness of the request and shall disburse an appropriate amount of money to the defendant's attorney. The ruling on the reasonableness of the request shall be made at an in camera hearing. In making the ruling, the court shall be guided by the need to provide a complete and full defense for the defendant." The quoted text is now designated subdivision (a) of the same statute.

[16] Counsel was paid 15 percent of the total fee at the time of appointment; 25 percent upon completion of the preliminary hearing; 10 percent upon trial confirmation; 15 percent upon conclusion of the prosecution's case-in-chief; 15 percent upon conclusion of the trial; and 20 percent after sentencing and submission of final accounting under section 987.9.

[17] Defendant contends the following handwritten notations that appear on the fee agreement nullify the provision that "the above [Penal Code] 987.9 costs are included in the authorized case compensation, unless additional amounts are authorized by the [Fresno County Superior Court]": "Category fees to pay for all attorney and expert costs" and "All attorney and expert costs included within Category 3 authorization." Where, as here, the meaning of counsel's compensation agreement does not turn on the credibility of extrinsic evidence, interpretation is a question of law, and we will independently determine the agreement's meaning. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866 [44 Cal.Rptr. 767, 402 P.2d 839].) " 'If contractual language is clear and explicit, it governs.' " (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868 [77 Cal.Rptr.2d 107, 959 P.2d 265].) Defendant cites nothing in the record to substantiate his claim. Our interpretation of the agreement is guided by the basic principle that "[a]ny contract must be construed as a whole, with the various individual provisions interpreted together so as to give effect to all, if reasonably possible or practicable." (*City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1998) 68 Cal.App.4th 445, 473 [80 Cal.Rptr.2d 329], citing Civ. Code, § 1641; Code Civ. Proc., § 1858.) Courts must interpret the contractual language to give force and effect to every provision and avoid an interpretation that "renders some clauses nugatory, inoperative or meaningless." (*City of Atascadero*, at p. 473.) No inconsistency arises by giving full effect to the provisions quoted above. The category fees did include *all* attorney and expert fees. The printed proposal form refers to section 987.9 five times. In his attachment, counsel refers to that section twice and makes clear that the potential costs listed are merely estimates of possible "cold dollar amounts." The record does not support a conclusion that the parties intended to nullify defendant's statutory rights under section 987.9 and preclude counsel from seeking additional funding if necessary.

evaluation the court would determine what category of compensation to authorize. Counsel could then agree, or not, to accept appointment under the court-approved category. Under both the agreement and section 987.9, counsel could seek additional funds for ancillary services upon a showing of need.

Here, in connection with his appointment, counsel proposed that defendant's case be designated as a Category 3 matter, calling for the highest compensation rate. He outlined an estimated $60,000 in investigative and expert costs in a two-page attachment. He made clear his outlined costs were merely estimates. He stated he could not set out fixed costs "in cold dollar amounts" at so early a stage of the proceedings and explained why. As discussed in greater detail below, he identified a number of potential expenditures that ultimately were not required. After defendant's trial, counsel submitted a final accounting. According to that accounting, counsel received $80,000. Of that amount, $8,676.15 was to cover ancillary costs under section 987.9. The amount of ancillary costs included a "professional courtesy discount" of $780. It does not include expenditures of $2,272.88 paid to the public defender before he declared a conflict in this case.

### 2. Assertedly Invalid Compensation Agreement

Defendant relies primarily on *Barboza, supra,* 29 Cal.3d 375, in arguing this judgment should be reversed because counsel's lump sum compensation agreement inherently created an irreconcilable conflict of interest. His reliance fails. In *Barboza,* two codefendant brothers appealed their assault convictions claiming ineffective assistance of counsel due to conflict of interest. Both were represented by the county public defender's office. Under an agreement with the county, the public defender's office was to be paid $104,000 annually. From that amount, $15,000 was set aside in a reserve account to pay appointed private counsel if the public defender's office declared a conflict of interest. On a monthly basis, any deficiency in the reserve account was deducted from the public defender's compensation and budget and deposited in the reserve account. (*Id.* at p. 378.) At the end of the year, any unexpended funds from the reserve account were paid to the public defender. If the account was overspent, "the public defender was liable for any deficiency." (*Id.* at p. 379.)

The court held that as a " 'judicially declared rule of criminal procedure' " the fee agreement created an inherent and irreconcilable conflict of interest that required reversal of the codefendants' convictions. (*Barboza, supra,* 29 Cal.3d at p. 381.) The agreement created a "real and insoluble tension" between the public defender's duty to investigate and declare a conflict on the one hand and his interest in maximizing his office budget on the other. (*Id.* at pp. 380–381.) The fewer conflicts declared, the fewer demands on the reserve account, leaving more income and operating funds for the public defender.

Notably, the court in *Barboza* did not reach the question of whether, even in the absence of the fee agreement, there was an actual conflict of interest between the codefendants. (*Barboza, supra*, 29 Cal.3d at p. 381.) Relief was based on the judicially created procedural rule. In the court's view, the public defender's declaration of a conflict would directly affect the financial interests of that office. In such a circumstance, the potential for bias was neither remote nor tenuous. (*Id.* at p. 380.) The court acknowledged that in order to assure that joint representation of multiple defendants is conflict free, trial courts rely in large measure on the ethical obligations of counsel representing multiple defendants to declare conflicts. (*Id.* at pp. 378, 381.) The agreement in *Barboza* precluded such reliance on the public defender's conflict determinations, however, because, "[n]o matter how well-intentioned the public defender might [have] be[en]," his decisions "directly affected" his income and office budget. (*Id.* at p. 381.)

We emphasize, however, that the agreement in *Barboza* operated in the context of multiple representation cases, a situation rife with potential for conflicts. (See *People v. Mroczko* (1983) 35 Cal.3d 86, 103–104 [197 Cal.Rptr. 52, 672 P.2d 835] (*Mroczko*).) *Barboza* specifically concerned the public defender's duty to investigate and declare conflicts between multiple defendants. Even in this context, the court stressed the unique circumstances of the conflict confronting the public defender. "Unlike the typical conflict which may arise when single counsel represents multiple defendants, the initial conflict [in *Barboza*] arose the *moment* that the public defender was appointed to represent the two defendants." (*Barboza, supra*, 29 Cal.3d at p. 379, italics added.) He was immediately confronted with investigating and discovering any conflict existing between the defendants as well as maintaining his salary and office budget. (*Ibid.*)

This case is clearly distinguishable from *Barboza*. The agreement concerned appointed counsel's representation of defendant alone and thus did not exacerbate a situation in which conflicts already were inherent. To be sure, defendant's complaint ultimately concerns the impact of an asserted financial disincentive created by the fee agreement on counsel's performance at trial. *Barboza*, however, confronted a very different kind of problem involving the public defender's duty to declare conflicts of interest in multiple representation cases. The county's compensation agreement with the public defender related to his salary, office budget, and payment for alternate counsel appointed in conflicts cases. The court's chief concern was that the public defender's determinations about whether to remove that office from a case were affected by the actual conflict of interest created by the agreement. (*Barboza, supra*, 29 Cal.3d at pp. 380–381.) The court's inability to rely on the public defender's conflict determinations could impact its ultimate obligation to assure indigent defendants conflict-free representation. Nothing in

*Barboza* suggests that there was a provision for the public defender to apply for augmentation to his budget.

Defendant accurately argues that under the agreement his lawyer could maximize his own compensation by cutting expenses for investigative and expert services. This theoretical possibility, however, is qualitatively no different from other flat fee agreements that have been held acceptable. For example, in *People v. Knight* (1987) 194 Cal.App.3d 337, 346–348 [239 Cal.Rptr. 413], the Court of Appeal rejected a contention that the county's compensation agreement with private attorneys for representation of indigent defendants contained an inherent conflict of interest because it paid a flat fee whether the defendant pleaded guilty or went to trial, permitted attorneys to engage in private practice, and limited the amount of investigators' fees. The court declined to hold that the provisions presented a potential conflict of interest that led to impairment of counsel's representation. (*Id.* at p. 348.) Similarly, in *Phillips v. Seely* (1974) 43 Cal.App.3d 104, 117 [117 Cal.Rptr. 863], the Court of Appeal concluded a county's flat fee agreement with an attorney for daily representation of indigent defendants that included investigative costs in the attorney's monthly fee did not give rise to a conflict of interest.

■ We have observed that: " '[A]lmost any fee arrangement between attorney and client may give rise to a "conflict." An attorney who received a flat fee in advance would have a "conflicting interest" to dispose of the case as quickly as possible, to the client's disadvantage; and an attorney employed at a daily or hourly rate would have a "conflicting interest" to drag the case on beyond the point of maximum benefit to the client. [¶] The contingent fee contract so common in civil litigation creates a "conflict" when either the attorney or the client needs a quick settlement while the other's interest would be better served by pressing on in the hope of a greater recovery. The variants of this kind of "conflict" are infinite. Fortunately most attorneys serve their clients honorably despite the opportunity to profit by neglecting or betraying the client's interest.' " (*Maxwell v. Superior Court* (1982) 30 Cal.3d 606, 618–619, fn. 8 [180 Cal.Rptr. 177, 639 P.2d 248] (*Maxwell*).)

The agreement here permits appointed counsel to responsibly and ethically carry out professional obligations to clients. As with certain contracts described in *Maxwell*, some attorneys might conceivably take advantage of the agreement's terms to increase their income at the expense of their clients' interests. In general, however, we assume attorneys are not so unethical as to neglect their clients' interests to advance their own. Any such obvious malfeasance is clearly the exception not the rule. In any event, a mere possibility for misconduct is insufficient to invalidate this agreement. (See *Phillips v. Seely, supra,* 43 Cal.App.3d at p. 117.)

For these reasons, we decline to extend *Barboza*'s judicially declared rule of criminal procedure to Fresno County Superior Court's lump sum compensation agreement.[18] Accordingly, defendant can prevail on his claim only if he can demonstrate a violation of his constitutional rights.

### 3. *Asserted Conflict of Interest Under the State and Federal Constitutions*

■ A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. This constitutional right includes the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client. (See *Glasser v. United States* (1942) 315 U.S. 60, 69–70 [86 L.Ed. 680, 62 S.Ct. 457] (*Glasser*); *People v. Douglas* (1964) 61 Cal.2d 430, 436–439 [38 Cal.Rptr. 884, 392 P.2d 964].) "It has long been held that under both Constitutions, a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant." (*People v. Rundle* (2008) 43 Cal.4th 76, 168 [74 Cal.Rptr.3d 454, 180 P.3d 224] (*Rundle*).) "As a general proposition, such conflicts 'embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or his own interests. [Citation.]' " (*People v. Cox* (1991) 53 Cal.3d 618, 653 [280 Cal.Rptr. 692, 809 P.2d 351], quoting *People v. Bonin* (1989) 47 Cal.3d 808, 835 [254 Cal.Rptr. 298, 765 P.2d 460].) In this case, defendant claims counsel labored under a financial conflict of interest in violation of his federal and state constitutional rights.

■ In *Mickens v. Taylor* (2002) 535 U.S. 162 [152 L.Ed.2d 291, 122 S.Ct. 1237] (*Mickens*), the high court confirmed that claims of Sixth Amendment violation based on conflicts of interest are a category of ineffective assistance of counsel claims that, under *Strickland, supra*, 466 U.S. at page 694, generally require a defendant to show (1) counsel's deficient performance, and (2) a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different. (*Rundle, supra*, 43 Cal.4th at p. 169, citing *Mickens, supra*, 535 U.S. at p. 166.) In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest *"that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." (*Mickens, supra*, 535 U.S. at p. 171; see *Rundle, supra*, 43 Cal.4th at

---

[18] We limit our conclusion in this regard to the facts before us. We note that as of January 1, 2004, Fresno County Superior Court's policies require that any unexpended section 987.9 funds be returned to the court upon the filing of the final accounting.

p. 169.) "[I]nquiry into actual conflict [does not require] something separate and apart from adverse effect." (*Mickens, supra*, 535 U.S. at p. 172, fn. 5.) "An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." (*Ibid.*)

■ This court has suggested that a determination of whether counsel's performance was "adversely affected" under the federal standard "requires an inquiry into whether counsel 'pulled his punches,' i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are . . . bound by the record. But where a conflict of interest causes an attorney not to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission." (*People v. Cox* (2003) 30 Cal.4th 916, 948–949 [135 Cal.Rptr.2d 272, 70 P.3d 277], italics omitted.)

With regard to the prejudice requirement, the high court has recognized a presumption of prejudice applies when defense counsel "actively represented conflicting interests."[19] (*Mickens, supra*, 535 U.S. at p. 166.) It stressed "the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice" justified application of the presumption.[20] (*Mickens*, at p. 175, citing *Cuyler v. Sullivan* (1980) 446 U.S. 335, 348–349 [64 L.Ed.2d 333, 100 S.Ct. 1708] (*Sullivan*); *Holloway, supra*, 435 U.S. at pp. 490–491.) We have agreed with the high court that "the presumption of prejudice is a prophylactic measure established to address 'situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel.' " (*Rundle, supra*, 43 Cal.4th at p. 173, quoting *Mickens, supra*, 535 U.S. at p. 176.)

---

[19] In *Glasser, supra*, 315 U.S. at page 75, counsel's "struggle to serve two masters" was demonstrated in the record by his failure to develop evidence and failure to object to arguably inadmissible evidence as a result of his desire to protect the defendant's codefendant. After identifying this conflict of interest, the court reversed the defendant's conviction without a showing of prejudice. (*Mickens, supra*, 535 U.S. 172, fn. 5, citing *Holloway v. Arkansas* (1978) 435 U.S. 475, 482 [55 L.Ed.2d 426, 98 S.Ct. 1173] (*Holloway*).)

[20] In dicta, the high court indicated that its jurisprudence does not establish or support the lower courts' expansive application of a presumption of prejudice " 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts.' " (*Mickens, supra*, 535 U.S. at p. 174, quoting *Beets v. Scott* (5th Cir. 1995) 65 F.3d 1258, 1266 (en banc) (*Beets*); see *Mickens*, at pp. 174–175 [noting a presumption of prejudice was applied when the defendant's representation implicated counsel's personal or financial interests, employment with the prosecutor' office, instruction to Internal Revenue Service agents, romantic involvement with the prosecutor, or fear of provoking the trial judge].) The question whether the presumption should apply to other conflicts remains open. (*Mickens*, at p. 176.)

In this case, defendant contends that his Sixth Amendment right to counsel was violated because counsel labored under an actual conflict of interest arising from counsel's compensation agreement. That is, his conflict of interest claim arose not because of a conflict among clients but between his lawyer's interest in maximizing fees and defendant's interest in full investigation. He urges the compensation agreement created an actual conflict of interest that divided counsel's loyalties and adversely affected his performance. In support, defendant asserts numerous deficiencies by counsel as part of his federal constitutional claim, state constitutional claim, or both. As discussed below, we adopt the federal constitutional standard for evaluating claims of conflict of interest under our state Constitution and thus analyze defendant's claims under only the federal standard.

█ Under our state Constitution, the right to counsel includes the correlative right to conflict-free representation. (*People v. Douglas, supra*, 61 Cal.2d at pp. 436–439.) We have formulated a different standard of review of conflict of interest claims than that employed under federal law to analyze analogous Sixth Amendment claims. In order to establish a violation of the right to conflict-free counsel, we require a defendant to (1) show counsel labored under a potential conflict of interest, and (2) raise an informed speculation that the potential conflict adversely affected counsel's performance. (*Rundle, supra*, 43 Cal.4th at p. 175.)

The phrase " 'informed speculation' " was first employed in *People v. Chacon* (1968) 69 Cal.2d 765, 776, footnote 3 [73 Cal.Rptr. 10, 447 P.2d 106] (*Chacon*). We borrowed the informed speculation concept from *Lollar v. United States* (D.C. Cir. 1967) 126 U.S. App.D.C. 200 [376 F.2d 243] (*Lollar*), to assess prejudice resulting from a conflict of interest arising from counsel's joint representation of codefendants in violation of the state and federal Constitutions. (*Chacon*, 69 Cal.2d at p. 776, fn. 3, quoting *Lollar*, 376 F.2d at p. 247.) The court wrote: " '[O]nly where " 'we can find no basis in the record for an informed speculation' that [the defendant]'s rights were prejudicially affected" can the conviction stand.' "[21] (*Chacon*, at p. 776, fn. 3.)

Over the course of the ensuing 40 years, a precise definition of our informed speculation concept has proven elusive and the concept has been somewhat variously applied. (Compare *Chacon, supra*, 69 Cal.2d at p. 776,

---

[21] In effect, *Lollar, supra*, 376 F.2d at page 247, had " 'adopt[ed] the standard of "reasonable doubt," a standard the Supreme Court recently said must govern whenever the prosecution contends the denial of a constitutional right is merely harmless error.' " (*Chacon, supra*, 69 Cal.2d at p. 776, fn. 3.) Under that standard, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824] (*Chapman*).)

fn. 3 [equating the concept of informed speculation in assessing prejudice resulting from a conflict of interest with the reasonable doubt standard under *Chapman*] and *In re Watson* (1972) 6 Cal.3d 831, 845 [100 Cal.Rptr. 720, 494 P.2d 1264] [finding "no basis in the record for even an 'informed speculation' that petitioner's rights were prejudicially affected"; any conflict based on counsel's joint representation was harmless beyond a reasonable doubt] with *People v. Cook* (1975) 13 Cal.3d 663, 670 [119 Cal.Rptr. 500, 532 P.2d 148] [a denial of the right to effective assistance of counsel is shown "if the record provides an adequate basis for an 'informed speculation' that there was a potential conflict of interest which prejudicially affected the defendant's right to effective counsel"], *Mroczko, supra*, 35 Cal.3d at p. 105 ["even a potential conflict may require reversal if the record supports 'an informed speculation' that [the defendant]'s right to effective representation was prejudicially affected"], *People v. Frye* (1998) 18 Cal.4th 894, 998 [77 Cal.Rptr.2d 25, 959 P.2d 183] [a violation of the right to effective assistance of counsel is established if "the record supports an 'informed speculation' that the asserted conflict adversely affected counsel's performance"], and *Rundle*, 43 Cal.4th at p. 175 ["under the state Constitution we have required only that the record support an 'informed speculation' that a 'potential conflict of interest' impaired the defendant's right to effective assistance of counsel"].)

Moreover, contrary to defendant's assertions, although this court has applied a presumption of prejudice to conflicts of interest arising from an attorney's concurrent representation of adverse clients (*Rundle, supra*, 43 Cal.4th at p. 172, citing *People v. Easley* (1988) 46 Cal.3d 712 [250 Cal.Rptr. 855, 759 P.2d 490]; *Mroczko, supra*, 35 Cal.3d 86; *Chacon, supra*, 69 Cal.2d 765), we have never eliminated our general requirement that a defendant demonstrate outcome-determinative prejudice from a violation of his state constitutional right to conflict-free counsel in order to obtain relief. "[A]ll trial court error under California law is governed by article VI, section 13 of the California Constitution: 'No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, . . . or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' " (*People v. Crayton* (2002) 28 Cal.4th 346, 364 [121 Cal.Rptr.2d 580, 48 P.3d 1136].) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see *Rundle, supra*, 43 Cal.4th at pp. 175–176 [defendant

failed to demonstrate under the state constitutional standard that he was prejudiced by the conflict of interest, which did not impact the presentation of the defense case].)

■ As noted, post-*Strickland*, the high court's analysis of Sixth Amendment conflict of interest claims has evolved into one of ineffective assistance of counsel, which requires a defendant to show counsel's deficient performance and a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different. (*Rundle, supra,* 43 Cal.4th at p. 169, citing *Mickens, supra,* 535 U.S. at p. 166.) Upon close examination of the federal standard and our own, we discern no ultimate substantive difference between the two. Our elusive and somewhat varied application of our state standard over the past four decades, moreover, strongly suggests that our informed speculation formulation is too amorphous to provide meaningful guidance to either the bench or bar.

We therefore conclude that employing both standards is unnecessary and confusing. In the final analysis, both standards involve a consideration of prejudice in the outcome. The federal constitutional approach zealously protects a criminal defendant's constitutional right to conflict-free counsel. The federal articulation of the constitutional requirements is clear and provides a more meaningful framework for review. Today, we therefore harmonize California conflict of interest jurisprudence with that of the United States Supreme Court and adopt the standard set out in *Mickens.*

Accordingly, we reject defendant's state conflict of interest claim for the reasons stated below in our federal analysis. We disapprove those earlier cases to the extent that they can be read to hold that attorney conflict claims under the California Constitution are to be analyzed under a standard different from that articulated by the United States Supreme Court.[22]

As a preliminary observation applicable to each of the subclaims below, counsel's final accounting shows he spent a total of $8,676.15 in ancillary

---

[22] We therefore disapprove to this extent the following cases: *People v. Rundle, supra,* 43 Cal.4th 76; *People v. Zambrano* (2007) 41 Cal.4th 1082 [63 Cal.Rptr.3d 297, 163 P.3d 4]; *People v. Cornwell* (2005) 37 Cal.4th 50 [33 Cal.Rptr.3d 1, 117 P.3d 622]; *People v. Dunkle* (2005) 36 Cal.4th 861 [32 Cal.Rptr.3d 23, 116 P.3d 494]; *People v. Roldan* (2005) 35 Cal.4th 646 [27 Cal.Rptr.3d 360, 110 P.3d 289]; *People v. Cox, supra,* 30 Cal.4th 916; *People v. Frye, supra,* 18 Cal.4th 894; *People v. Sanchez* (1995) 12 Cal.4th 1 [47 Cal.Rptr.2d 843, 906 P.2d 1129]; *People v. Kirkpatrick* (1994) 7 Cal.4th 988 [30 Cal.Rptr.2d 818, 874 P.2d 248]; *People v. Clark* (1993) 5 Cal.4th 950 [22 Cal.Rptr.2d 689, 857 P.2d 1099]; *People v. Cox, supra,* 53 Cal.3d 618; *People v. Easley, supra,* 46 Cal.3d 712; *People v. Belmontes* (1988) 45 Cal.3d 744 [248 Cal.Rptr. 126, 755 P.2d 310]; *People v. Mroczko, supra,* 35 Cal.3d 86; *Maxwell v. Superior Court, supra,* 30 Cal.3d 606; *People v. Cook, supra,* 13 Cal.3d 663; *In re Watson, supra,* 6 Cal.3d 831; and *People v. Chacon, supra,* 69 Cal.2d 765.

expenses. Although the amount does not include funds expended by the public defender, or take into account the professional discount for services, it is certainly less than the original $60,000 estimate. Counsel was therefore entitled to retain $71,323.85 of the $80,000 Category 3 fee. We consider these disparities in the context of the facts and the asserted deficiencies in counsel's performance to determine whether an actual conflict of interest adversely affected counsel's representation. (*Mickens, supra,* 535 U.S. at p. 172, fn. 5.) In any circumstance in which defendant succeeds in demonstrating an actual conflict affected counsel's performance, we will then address the prejudice prong of the federal standard, applying the standard under *Strickland.* We note that defendant's reliance on these facts is different from a general attack on the contract itself. Rather than arguing that *any* lawyer operating under the contract would have an irreconcilable conflict, defendant argues that these facts show that *his* lawyer had an actual conflict of interest that affected his performance.

> a. *Investigator Jeff Gunn and prospective prosecution penalty phase witnesses*

Defendant asserts that defense investigator Jeff Gunn's invoices show he worked only 13.5 hours before counsel announced ready for trial; had spoken to no alibi witnesses except Donna Doolin Larsen by the first day of trial; had not prepared written reports on alibi witnesses Jim Bacon and David Daggs until two days before the defense case opened; and never contacted prospective prosecution penalty phase witnesses D., Denise Hamblen, Faith Ruacho, or Florence April Chavez.

> (1) *Alibi witnesses Jim Bacon and David Daggs*

Defendant's complaint is misleading. He fails to mention that Gunn had originally worked on this case for about two and one-half months as the investigator for the Fresno County Public Defender and had conducted approximately 90 hours of investigation before the public defender declared a conflict. Defendant does not account for this work nor does he establish that Gunn did *not* interview Bacon and Daggs when he worked for the public defender. Moreover, it is certainly possible that Gunn interviewed Bacon and Daggs while working for the public defender but did not complete his reports of these two interviews until later. Even considering the disparity between counsel's estimated and actual ancillary expenses noted above, defendant has not established that either Gunn's performance or counsel's representation, was affected by the asserted conflict. He therefore fails to satisfy the deficient performance prong under *Strickland.* (*Mickens, supra,* 535 U.S. at p. 171.)

(2) *Prospective prosecution penalty phase witnesses*

■ By statute, before trial begins, the prosecutor must give a capital defendant notice of any aggravating evidence it may seek to offer during the penalty phase. (§ 190.3.) The prosecution's notice included evidence of "aggressive conduct" toward prospective witnesses D., Hamblen, Ruacho, and Chavez. Ruacho did not testify at all. The other three women were not identified as witnesses for the prosecutor's case-in-chief. They testified only at the guilt phase in rebuttal to Dr. Terrell's testimony that defendant suffered from no mental disorder and did not match the "typical profiles" he would have expected to see in a murderer (Evid. Code, §§ 721, subd. (a), 780), and to impeach defendant's testimony regarding his own good character (Evid. Code, § 1101, subd. (c)). D. testified, in part, that defendant forced her to have sexual intercourse with him. The jury was instructed at the penalty phase that it could consider this evidence as aggravating other-crimes evidence under section 190.3, factor (b).

■ Counsel's primary "duty is to investigate the facts of his client's case and to research the law applicable to those facts." (*People v. Ledesma* (1987) 43 Cal.3d 171, 222 [233 Cal.Rptr. 404, 729 P.2d 839].) Counsel's decisions regarding strategy and tactics must be rational and " 'founded upon adequate investigation and preparation.' " (*In re Thomas* (2006) 37 Cal.4th 1249, 1258 [39 Cal.Rptr.3d 845, 129 P.3d 49].)

There is no discernable tactical explanation on the record for counsel's failure to investigate the prospective prosecution penalty phase witnesses. Unconflicted counsel reasonably would investigate the prosecution's aggravating evidence both to make informed tactical decisions and to advise defendant about whether to testify. Our inquiry does not end here, however. Defendant has not established that counsel's failure to interview these witnesses was motivated by his asserted desire to keep for himself funds initially budgeted for this investigation. It does not follow logically that the absence of an explanation discernable in the record for the absence of interviews can be attributed only to the financial conflict defendant urges. Explanations unrelated to counsel's fee agreement could account for counsel's omission. Counsel may have delayed conducting this investigation until after the guilt phase in anticipation that these witnesses would testify only at the penalty phase. The record shows that, with the exception of Ruacho who did not testify, the prosecutor called the prospective witnesses listed on the notice of aggravating evidence only in rebuttal after defendant presented evidence of his good character. In any event, we do not conclude that the only explanation for counsel's failure to investigate the prospective prosecution rebuttal witnesses is the asserted conflict of interest. Defendant therefore fails to show the asserted conflict adversely affected counsel's performance regarding this investigation.

### b. *Ballistics analysis*

Defendant complains that the defense ballistics expert did not analyze the evidence until four days before the guilt phase of the trial began. Any delay, for whatever reason, is immaterial. The analysis was completed before trial. The defense expert agreed with the two prosecution experts. Defendant's .45-caliber Firestar was used to kill Tucker and Espinoza, and shell casings found near Espinoza and Kachman were fired from that same gun. The casings recovered from the Alva crime scene could have been fired from Shana Doolin's Lorcin. Defendant's bare assertion fails to satisfy the deficient performance prong under *Strickland.*

### c. *Blood analysis*

Defendant claims that defense counsel failed to retain an expert to perform blood analysis even though he included a blood analysis expert in his initial estimate of costs. Merely because defense counsel originally believed he might need expert blood analysis does not establish that he failed to obtain expert assistance because of the asserted conflict. Further, there is no evidence that counsel's performance was in any way substandard. No evidence suggested the shooter left blood at any of the crime scenes. No blood was found in either defendant's truck or his mother's car. The prosecution's evidence, moreover, provided overwhelming evidence of defendant's guilt. Ballistics evidence confirmed defendant's gun was used to shoot Tucker, Espinoza, and Kachman. Each of the four attempted murder victims identified defendant in court as her assailant. Tucker's boyfriend identified defendant as the driver who picked up Tucker shortly before her murder. Defendant's sister lived with defendant at the time of the shootings. Her .25-caliber handgun could have been used in the Alva shooting. Under these circumstances, unconflicted counsel could reasonably have decided a blood analysis expert would contribute nothing to the defense. Defendant's assertions do not show deficient performance under *Strickland.*

### d. *DNA analysis*

Defendant complains that defense counsel delayed his request for retesting of DNA evidence obtained from victim Espinoza's body until after the jury returned its guilty verdicts, and failed to seek DNA analysis of the vaginal samples obtained from D., who testified during guilt phase rebuttal about defendant's forcible rape.

The record, however, belies any reasonable inference that the compensation agreement affected counsel's decision making about DNA analyses. In responding to defendant's *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d

118 [84 Cal.Rptr. 156, 465 P.2d 44]) at the sentencing hearing, defense counsel explained that DNA analysis of the semen obtained from victim Espinoza was not relevant. The victims all were working prostitutes. Based on the testimony of the survivors, they were shot because they refused to have sexual intercourse with the shooter unless they were paid first. Three of the women testified there was no act of intercourse with defendant, and during the incident with victim Kachman, defendant wore a condom. Any DNA obtained at the scene or from the victims could certainly have belonged to other customers. There is no hint in this logical explanation that counsel was influenced by a desire to maximize his income. Again, ballistics and identification testimony were strong evidence of defendant's guilt.[23] Faced with these circumstances, reasonable and unconflicted counsel could legitimately decide that retesting of Espinoza's DNA would be pointless.

Vaginal samples were originally obtained from D. following her earlier police compliant that defendant raped her. The prosecution established that sperm was present in the vaginal samples. Even though defendant testified that he never had intercourse with D., he admitted to having an intermittent relationship with her and told D.'s brother that she had stayed overnight with him around the time of the alleged rape. At trial, defendant denied he told police during the rape investigation that "if they had found any semen, it would be because she had saved it in a cup and poured it on herself." He explained, "I—I don't remember that—that statement. It might have been made. I don't know. I was very upset of course, you know somebody making that allegation. . . ." Defendant later testified that he "might have" made such a statement but had "no idea" because the incident occurred so long ago. Finally, when D. became pregnant by her former boyfriend, defendant wanted her to sign a letter he drafted stating, in essence, that he was not the father of the baby. Any decision by counsel to forgo DNA testing to determine the identity of the sperm donor thus appears to have been a reasonable, tactical choice, not one motivated by the asserted conflict of interest. Had testing shown defendant to have been the donor, his credibility would have suffered a significant blow. Evidence of a different donor would have been susceptible of various explanations and of limited value in light of all the other evidence on this topic.

### e. Tire tread analysis

Defendant complains that defense counsel failed to consult with an expert to analyze the tire tread evidence even though the prosecutor provided him with reports from his expert before trial. As noted, the prosecution's evidence

---

[23] No eyewitness testified regarding the circumstances of Espinoza's murder. Ballistics evidence established shell casings found at the Espinoza and Kachman crime scenes were fired from defendant's Firestar .45-caliber handgun, and Kachman identified defendant.

pointed unerringly to defendant's guilt. The tire tread evidence, in contrast, was neither conclusive nor crucial on the issue of identity. The People's own expert could conclude only that the tire impressions depicted in the photographs were "similar" to the tire treads on defendant' truck. Evidence this insubstantial did not require expert refutation. Sound defense tactics would counsel that the less said about this evidence the better.

### f. Defense experts and background investigation

Defendant complains that psychiatrist Howard Terrell, who testified in the guilt phase, spent only one hour with him and conducted a four-hour document review. As a result, the prosecutor exploited the expert's unfamiliarity with the contents of police reports of prosecution witnesses and defendant's uncharged conduct. Defendant also finds fault with counsel because psychologist Hedberg did not administer any tests to defendant until a few days before the penalty phase began. He also claims Dr. Hedberg "did no work" regarding his testimony on the limitations of eyewitness testimony until the day he testified in the guilt phase. Defendant does not otherwise explain this assertion. The record shows Dr. Hedberg had testified as an expert on this subject "several hundred times." Defendant alleges counsel delayed asking Dr. Hedberg to conduct his tests hoping that a favorable guilt phase verdict would obviate the need for a penalty phase. Finally, defendant asserts that defense counsel never conducted the background investigation and "extensive psychiatric and social study" he estimated might be necessary at the outset of his involvement in this case.

### (1) The defense psychiatrist and psychologist

When counsel was appointed, he indicated an "extensive" psychiatric evaluation of defendant was necessary because defendant intended to plead not guilty by reason of insanity. Counsel hired an experienced psychiatrist, Dr. Terrell, who testified at the guilt phase that he had examined over 100 murderers and a dozen serial killers. This defense expert concluded that defendant was neither psychotic nor the victim of disordered personality, thus undermining any potential insanity defense as a viable tactic and the need for a more extensive psychiatric study. Terrell's conclusion was corroborated by Dr. Hedberg who also interviewed and tested defendant and testified at the penalty phase.

There is nothing in the record to support even a suspicion that these experts' conclusions were in any way influenced by the asserted conflict of

interest. Nor is there a basis in this record from which we can speculate that any delay in retaining or preparing these experts was attributable to the asserted conflict.[24]

### (2) *Background investigation and social study*

Defendant contends that counsel failed to conduct a background investigation and social study of defendant because of the asserted conflict of interest. Before trial, counsel budgeted $15,000 for "Background (lifetime) investigation of Defendant for penalty phase social study report" and $10,000 for engaging the services of a "Psychiatrist and Social Worker." His final accounting shows that he spent approximately $4,500 for services provided by the defense psychiatrist and psychologist.

At the hearing on his motion for a continuance, brought three days before the penalty phase was scheduled to begin, counsel related he had not contacted defendant's 16 potential character witnesses. The prosecutor had complained he had not received discovery regarding statements of witnesses the defense intended to call in the penalty phase. Defense counsel responded that he had intentionally not interviewed those witnesses. In counsel's view, statements defendant made to counsel about what the witnesses would say were privileged and not subject to discovery.

At the penalty trial, Dr. Hedberg, the clinical psychologist, was the sole witness called on defendant's behalf. Dr. Hedberg's testimony focused on his psychological testing of defendant and his conclusion that defendant was not psychotic, psychopathic, sociopathic, or suffering from any mental illness. The remainder of this expert's testimony outlined defendant's family history. Defendant's mother had been married four times. Two of defendant's stepfathers were verbally and emotionally abusive. Defendant "carries some unresolved resentment from his childhood that he has not worked out" that may periodically cause him to unintentionally express hostility or resentment. Counsel also introduced some of defendant's school records. Defendant's mother, sister, cousin, and several friends had testified during the guilt phase. These friends and relatives were able to provide counsel with information about defendant's childhood, relationships, and history.

In preparation for the penalty phase of a capital murder trial, counsel has an "obligation to conduct a thorough investigation of the defendant's

---

[24] As a result, we need not consider defendant's contention that the asserted delay in retaining Dr. Hedberg's services rendered counsel "unprepared to question prospective jurors whether mental issues might impact their penalty deliberations." The record shows that defense experts discovered no psychological condition to support an insanity defense. Throughout the trial defendant maintained he was innocent. He does not identify what "mental health issues" counsel would have been better prepared to address during voir dire had Dr. Hedberg been retained earlier.

background." (*Williams v. Taylor* (2000) 529 U.S. 362, 39 [146 L.Ed.2d 3896, 120 S.Ct. 1495]; see also *Wiggins v. Smith* (2003) 539 U.S. 510, 522 [156 L.Ed.2d 471, 123 S.Ct. 2527]; *In re Lucas* (2004) 33 Cal.4th 682, 728 [16 Cal.Rptr.3d 331, 94 P.3d 477].) "[I]nvestigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' [Citation.]" (*Wiggins, supra*, 539 U.S. at p. 524.)

Counsel spoke with defendant's mother, sister, cousin, and friends. Two experienced mental health professionals found no evidence defendant manifested any significant psychological conditions. Defense counsel expressly made a tactical choice to rely on defendant's own information about what potential character witnesses might say in order to evade the discovery procedure by relying on attorney-client privilege. The court made no ruling with regard to counsel's mention of his reliance on the privilege and neither side raises the issue of privilege on appeal. We do not express an opinion on how the court should have ruled had the issue of privilege been pressed. Likewise, nothing in this opinion should be interpreted as the approval of an attempt by either side to suppress discoverable material. In an abundance of caution, and in order to provide defendant with the broadest scope of reasonable review, we assume without deciding that defendant satisfies the deficient performance prong under *Strickland*.

 We now address the prejudice requirement. Preliminarily, defendant asserts we should apply a presumption of prejudice under *Sullivan* and reverse his death judgment. We disagree. In *Mickens*, the high court suggested that a presumption of prejudice need not attach to every conflict, but was appropriate for conflicts giving rise to a high probability of prejudice and corresponding difficulty of demonstrating such prejudice. (*Mickens, supra*, 535 U.S. at p. 175.) Moreover, we share the view of the Fifth Circuit Court of Appeals that *Strickland* provides the appropriate analytic framework for assessing prejudice arising from attorney conflicts of interest outside the context of multiple concurrent representation. (*Beets, supra*, 65 F.3d at p. 1265.)

In *Beets*, the court explained that a presumption of prejudice should be limited to the context of multiple concurrent representation because only in that context "is the duty of loyalty so plain. Only then is the risk of harm high enough to employ a near-*per se* rule of prejudice. While loyalty may be implicated in other judgments a lawyer makes, in no other category of conflicts is the risk of prejudice so certain as to justify an automatic presumption. [Citation.] When the duty of loyalty is challenged by an attorney's self-interest, the range of possible breaches . . . is virtually

limitless. Likewise, their consequences on the quality of representation range from wholly benign to devastating. [Citations.] Applying a near-*per se* rule of prejudice to this spectrum of potential ethical problems is a draconian remedy. [¶] . . . [¶] In stark contrast to multiple representation situations, there is little meaningful distinction between a lawyer who inadvertently fails to act and one who for selfish reasons decides not to act. The 'conflict' between the lawyer's self-interest and that of his client is not a real conflict in the eyes of the law. Rather than being immobilized by conflicting ethical duties among clients, a lawyer who represents only one client is obliged to advance the client's best interest despite his own interest or desires." (*Beets, supra,* 65 F.3d at pp. 1270–1271, fn. omitted.)

 Even the dissenting judge in *Beets* recognized that not every conflict of interest warrants a presumption of prejudice. (*Beets, supra,* 65 F.3d at p. 1297 (dis. opn. of King, J.).) " '[I]n a sense, every representation begins with a lawyer-client conflict. If the representation is for a fee, the lawyer's economic interest will be to maximize the amount of the fee and the client's will be to minimize it.' [Citation.] Conversely, if the representation is for a flat fee, the attorney's interest will be to minimize the amount of time spent on the case, and the client's interest will be to maximize it. . . . [¶] Thus, the [application of a presumption of prejudice] would swallow the *Strickland* rule if it were applied to every case in which a criminal defendant complains that his lawyer failed to investigate a witness or a defense, neglected to perform an experiment, did not hire a witness, or otherwise failed to take action because the attorney decided that it was not worth the time or the expense. . . . *Strickland* appropriately governs claims for failure to investigate and the like, and courts have had little difficulty in treating such claims under *Strickland*'s ineffectiveness rubric." (*Ibid.,* fn. omitted.) We adopt the reasoning from *Beets* and therefore conclude that, because the asserted conflict does not arise from multiple concurrent representation, a presumption of prejudice is not appropriate in this case. Here, our ability to gauge the impact of the asserted conflict on the penalty phase defense presented is not hampered by any concern that the *Strickland* standard is inadequate "to assure vindication of the defendant's Sixth Amendment right to counsel." (*Mickens, supra,* 535 U.S. at p. 176.) It is the record that undermines defendant's claim. He can point to nothing any witness might have presented by way of mitigation. Nor does he offer any indication that other witnesses beyond the friends and family members identified could have assisted him. We note that defendant has the opportunity to expand upon the record in the context of his right to pursue a writ of habeas corpus. (*Rundle, supra,* 43 Cal.4th at p. 174, fn. 48.)

Accordingly, because defendant has not established the asserted conflict of interest had any effect on either the guilt or the penalty phase verdict, he does

not "demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*Mickens, supra*, 535 U.S. at p. 166, quoting *Strickland, supra*, 466 U.S. at p. 694.)

### g. *Investigation of defense witnesses*[25]

Defendant claims that defense counsel failed to investigate and discover material relevant to the credibility of defense witnesses, including (1) alibi witness Bacon's notes that he claimed corroborated his explanation for remembering defendant's visit to him during the weekend of the Alice Alva assault; (2) medical records of Clara Larsen that contradicted Donna Doolin Larsen's alibi testimony for defendant on December 28; and (3) Donna Doolin Larsen's employment records contradicting her claim she was in Fresno during the weekend Alice Alva was assaulted.

The extent of reasonable investigation into witnesses identified by the defendant is a very complex question. We assume without deciding that defendant shows deficient performance under *Strickland*; that is, the asserted conflict adversely affected counsel's performance regarding the investigation of defense alibi witnesses.

In terms of prejudice, we have concluded a presumption of prejudice is not applicable to the conflict asserted here. On the merits, defendant fails to demonstrate a reasonable probability that he would have obtained a more favorable result in the absence of counsel's failure to investigate defense alibi witnesses. He fails to show, for example, what fruitful course of action counsel would have taken, if any, had he discovered the above material before Donna Doolin Larsen, other family members, and Bacon testified. He does not suggest counsel would have declined to call them. Moreover, both Donna Doolin Larsen and Bacon were impeached regarding other aspects of their alibi testimonies. Donna Doolin Larsen's credibility was significantly undermined. Bacon admitted he had taken notes during the preliminary examination testimony of other witnesses and looked at notes taken by defendant's sister and mother before testifying.

In sum, defendant's federal constitutional conflict of interest claim fails.[26]

---

[25] These assertions do not appear in defendant's state claim.

[26] The derivative claim that, because counsel labored under an unconstitutional conflict of interest, defendant was denied his rights to due process under the Fourteenth Amendment, confrontation under the Sixth Amendment, and a reliable determination of guilt and penalty in a capital case under the Eighth and Fourteenth Amendments, also fails. In arguments elsewhere, defendant asserts violation of his federal constitutional rights to due process under the Fourteenth Amendment, a fair trial by jury under the Sixth and Fourteenth Amendments,

### 4. *Alleged Equal Protection Violation*

Defendant contends use of the lump sum fee agreement by the Fresno County Superior Court violated the equal protection clause because it imposed "the burden of financially-conflicted counsel solely on that class of indigent criminal defendants who could not be represented by the Public Defender." In essence, this claim is a repackaging of his argument relying on the judicially declared rule from *Barboza*, which we have already rejected. (See *ante*, pt. II.A.2.)

### B. *Request for Second Counsel*

Defendant contends the trial court abused its discretion in denying his pretrial request for the appointment of second counsel, thereby depriving him of due process, the right to counsel, and the right to a reliable guilt and penalty phase determination.

Defense counsel filed a written pretrial request for the appointment of second counsel because (1) defendant was facing the death penalty; (2) the charges involved six victims and six crime scenes; (3) the issues involved ballistics, possible blood spatter evidence, psychiatric and psychological issues, a possible insanity defense, and eyewitness identifications; and (4) the trial was scheduled to begin in three weeks. The trial court denied defendant's request for "lack of cause."

 An indigent criminal defendant's right to a second attorney in a capital case is statutory, not constitutional. Appointment is permitted in the discretion of the trial court under section 987, subdivision (d).[27] (*People v.*

---

counsel under the Sixth Amendment, or a reliable determination of guilt and penalty in a capital case under the Eighth and Fourteenth Amendments. What we observed in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 [42 Cal.Rptr.3d 677, 133 P.3d 581], applies: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

[27] Section 987, subdivision (d) provides: "In a capital case, the court may appoint an additional attorney as a cocounsel upon a written request of the first attorney appointed. The

*Roldan, supra,* 35 Cal.4th at p. 686; *Keenan v. Superior Court* (1982) 31 Cal.3d 424, 428–430 [180 Cal.Rptr. 489, 640 P.2d 108].) In ruling on an application for second counsel, the trial court must be guided by the need to provide a capital defendant with a full and complete defense. (*Keenan, supra,* 31 Cal.3d at p. 431.) In exercising its discretion, the trial court must weigh "the importance this court has attached to pretrial preparation in providing a criminal defendant effective legal assistance" (*ibid.*) and "focus on the complexity of the issues involved, keeping in mind the critical role that pretrial preparation may play in the eventual outcome of the prosecution" (*id.* at p. 432). The initial burden is on the defendant to present a specific factual showing of "genuine need" for the appointment of second counsel. (*Id.* at p. 434.) We review the decision whether to grant a request to appoint second counsel under section 987 for abuse of discretion. (*People v. Roldan, supra,* 35 Cal.4th at p. 688.)

We need not decide whether the trial court erred in denying defendant's request for second counsel because any error was harmless. Defendant fails to explain or substantiate his claim that, because *Keenan* counsel was denied, defense counsel was unprepared for trial. The extensive evidence of defendant's guilt demonstrates that there is no reasonable probability of a more favorable outcome had *Keenan* counsel been appointed.[28] (*People v. Watson, supra,* 46 Cal.2d at p. 836; see *People v. Williams* (2006) 40 Cal.4th 287, 300–302 [52 Cal.Rptr.3d 268, 148 P.3d 47] [error by the trial court in *revoking* the appointment of *Keenan* counsel is evaluated under the *Watson* standard].) Further, although there is some indication in the record that counsel could have prepared differently for the penalty phase, there is no indication that counsel's penalty phase presentation might have differed if he had had the assistance of second counsel. Assuming that the trial court erred in denying counsel's request for second counsel and that this state law error

---

request shall be supported by an affidavit of the first attorney setting forth in detail the reasons why a second attorney should be appointed. Any affidavit filed with the court shall be confidential and privileged. The court shall appoint a second attorney when it is convinced by the reasons stated in the affidavit that the appointment is necessary to provide the defendant with effective representation. If the request is denied, the court shall state on the record its reasons for denial of the request."

[28] Defendant contends a trial court's error in denying *Keenan* counsel is reversible per se, but he offers no persuasive authority in support. *People v. Bigelow* (1984) 37 Cal.3d 731, 744 [209 Cal.Rptr. 328, 691 P.2d 994], on which defendant primarily relies, is inapposite in that it held a trial court's failure to exercise its discretion concerning the appointment of *advisory* counsel for a self-represented capital defendant in a capital case is reversible per se. Defendant also argues he should be accorded a presumption of prejudice under *United States v. Cronic* (1984) 466 U.S. 648 [80 L.Ed.2d 657, 104 S.Ct. 2039], based on his assertion that the denial of defense counsel's request for second counsel resulted in counsel's failure to interview a single background witness for the penalty phase and to subject the prosecution's case to meaningful adversarial testing at the penalty trial. He supports this contention neither factually nor legally.

impacted the penalty phase, we conclude there is no reasonable possibility that the jury would have rendered a different verdict had second counsel been appointed. (See *People v. Jackson* (1996) 13 Cal.4th 1164, 1232 [56 Cal.Rptr.2d 49, 920 P.2d 1254].)

### C. Evidence of Defendant's Character

Defendant contends that the trial court permitted improper impeachment of the defense psychiatrist. He claims the prosecutor's questions were an improper attempt to offer specific instances of irrelevant and inadmissible character evidence to prove conduct on a specific occasion, in violation of Evidence Code sections 1101, subdivision (a), and 1102, and were more prejudicial than probative under Evidence Code section 352. In addition, he argues the court also erred by admitting rebuttal evidence in the form of specific instances of defendant's bad character. Defendant urges both errors violated his right to due process under the Fourteenth Amendment. We reject defendant's contentions.

Preliminarily, as to both contentions, defendant argues that the items seized by police from his home on the day he was arrested, including the Pro Sniper videotape, *Soldier of Fortune* magazine, the .44-magnum handgun and various rifles and shotguns, pornographic magazines, mail-order bride materials, gun magazines, a bulletproof vest and other paraphernalia were irrelevant. Defendant has forfeited this issue because he failed to object to admission of any of the items except the Pro Sniper videotape. (Evid. Code, § 353.) In any event, on the merits, we conclude all of the items seized were probative of defendant's identity as the assailant, his intent to kill, and his motive for the shootings. (Evid. Code, § 210.)

### 1. The Prosecution's Cross-examination of Dr. Terrell

Over objection, the trial court ruled that the testimony of defense psychiatrist, Dr. Terrell, was admissible character evidence under Evidence Code section 1102,[29] relevant to show defendant was not disposed to commit the charged offenses.

Dr. Terrell had evaluated more than 100 murderers and a dozen serial killers. He considered whether defendant matched any of the following typical profiles that he would expect to see in a murderer: (1) the sadist who

---

[29] Evidence Code section 1102, subdivision (a), provides that opinion "evidence of the defendant's character or a trait of his character" is admissible "to prove his conduct in conformity with such character or trait of character." Under subdivision (b) of the same statute, such evidence is admissible when "[o]ffered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)." (Evid. Code, § 1102, subd. (b).)

enjoys inflicting pain on others and watching them suffer and die; (2) the sexual sadist who enjoys inflicting pain during sexual encounters, then beats, rapes, or kills his partners; (3) the antisocial career criminal; (4) the drug addict or alcoholic who kills when intoxicated; (5) the individual with no history of murder who kills because of anger or jealousy; (6) the killer for hire; (7) gang members who kill to protect their "turf"; (8) the psychotic individual who "hears voices" that command him or her to kill; and (9) the mercy killer who assists in a suicide to alleviate suffering.

On cross-examination, Dr. Terrell confirmed he had not received police reports that defendant had raped D. or told her he disliked prostitutes. Dr. Terrell was also unaware of any reports that defendant was obsessive about cleanliness when he stayed in motel rooms with his girlfriends; frequently carried a duffel bag full of guns; led a different life around his family; hid his girlfriends when his mother came to visit; had advertised in adult magazines; was twice rebuffed by a prostitute he approached on Fresno streets; consumed alcohol to the point of intoxication; called a woman a "bitch" when she declined a date with him; and showed photographs of people he claimed to have killed.

Defendant contends that the trial court abused its discretion by permitting this cross-examination, in violation of Evidence Code sections 1101, 1102, and 352. He has forfeited this claim by failing to object on these grounds at trial. (*People v. Coddington* (2000) 23 Cal.4th 529, 613 [97 Cal.Rptr.2d 528, 2 P.3d 1081]; *People v. Lucero* (2000) 23 Cal.4th 692, 715 [97 Cal.Rptr.2d 871, 3 P.3d 248].) The claim is also meritless.

■ At the outset, we observe that the matters about which Dr. Terrell was questioned on direct examination were ultimately offered as substantive evidence of defendant's character. The cross-examination questions were permitted for the limited purpose of impeaching the expert's opinion. An expert witness may be cross-examined about "the matter upon which his or her opinion is based and the reasons for his or her opinion." (Evid. Code, § 721, subd. (a).) The scope of this inquiry is broad and includes questions about whether the expert sufficiently considered matters inconsistent with the opinion. (*People v. Ledesma* (2006) 39 Cal.4th 641, 695 [47 Cal.Rptr.3d 326, 140 P.3d 657].) Thus, an adverse party may bring to the attention of the jury that an expert did not know or consider information relevant to the issue on which the expert has offered an opinion. (*People v. Bell* (1989) 49 Cal.3d 502, 532 [262 Cal.Rptr. 1, 778 P.2d 129].)

The cross-examination of Dr. Terrell was proper. The incidents were all relevant to the validity of his opinion that defendant's character was inconsistent with that of a murderer.[30] The prosecutor's questions fell within the scope of Dr. Terrell's direct testimony. The jury was properly instructed that questions and answers about the reported incidents could be considered only in determining the weight to be given to Dr. Terrell's opinion, and that the questions themselves were *not evidence* that the reported incidents were true. (CALJIC No. 2.42.)

### 2. *Prosecution's Rebuttal Evidence of Defendant's Bad Character*

Defendant testified on direct examination he did not hate women, was not hostile toward prostitutes, and thought prostitution should be legalized. On cross-examination, defendant denied ever using the services of a prostitute or telling anyone that prostitutes were dirty, sleazy, and cheap and should be removed from the earth. He denied drinking to the point he could not drive, using drugs, talking about his cocaine use with Justus Swigart, or allowing people to use drugs at his home. Defendant said he did not treat women differently when he was away from his family. He denied striking his girlfriend, Hamblen, or being indifferent to pain she experienced during sex. He denied advertising in an adult magazine, carrying a bag of guns, calling Sherry Saar a "bitch" because she turned him down for a date, or asking a girlfriend to hide when his mother came to visit. He denied that D. was his girlfriend, that he had had sex with her, or that he had used soap during intercourse. He explained that he bought a Taser, or stun gun, for self-protection and purchased a set of handcuffs "just to have them."

 Outside the presence of the jury, defense counsel objected to the admission of proposed rebuttal testimony by Margie Galloway, Sherry Saar, Justus Swigert, Christina Bills, Hamblen, D., and Chavez. Counsel argued the evidence was irrelevant and should be excluded under Evidence Code section 352 as unduly prejudicial and time consuming. The prosecution urged the defense had opened the door to impeachment by eliciting character testimony from both defendant and Dr. Terrell. The trial court ruled that the proffered

---

[30] See, e.g., *People v. Panah* (2005) 35 Cal.4th 395, 492 [25 Cal.Rptr.3d 672, 107 P.3d 790] (evidence of defendant's prior hit-and-run misdemeanor conviction was properly admitted on cross-examination to impeach the defense expert's testimony that defendant had no juvenile or adult convictions, to the extent that this conclusion affected the expert's opinion of defendant's mental state); *People v. Hughes* (2002) 27 Cal.4th 287, 334–335 [116 Cal.Rptr.2d 401, 39 P.3d 432] (the prosecutor's cross-examination regarding the expert psychologist's knowledge of the defendant's prison record was relevant to impeach expert's opinion testimony concerning defendant's work history); *People v. Hendricks* (1988) 44 Cal.3d 635, 642 [244 Cal.Rptr. 181, 749 P.2d 836] (the prosecutor properly impeached the expert witness's opinion of the defendant's mental state with other-crimes evidence).

evidence was proper rebuttal and denied the motion. It did not expressly expand on its ruling, but the arguments of counsel indicate the court admitted the proffered evidence under Evidence Code section 1101, subdivision (c), which provides that the prohibition against the admission of character evidence to prove a person's criminal disposition under that code section does not "affect[] the admissibility of evidence offered to support or attack the credibility of a witness."

The prosecution's rebuttal witnesses testified as follows:

Margie Galloway had seen defendant drink beer and had seen him intoxicated on two occasions. She frequently observed defendant carrying a gym bag with guns in it and had heard him comment several times that he did not like "whores and sluts."

Sherry Saar recounted that defendant "flew off the handle" and called her a "bitch" when she declined to date him.

Defendant's friend, Justus Swigert, usually saw him carrying guns in a duffel bag. Swigert knew defendant drank alcohol. Once, defendant became so intoxicated he had to spend the night at Swigert's residence. Defendant told Swigert he had used cocaine.

Christina Bills attended a party at defendant's apartment where alcohol and marijuana were consumed. She often saw defendant carrying guns in a duffel bag. Defendant told her he was involved with the Mafia.

Hamblen, one of defendant's former girlfriends, testified that the first time she had sexual intercourse was with defendant, and he covered her mouth when she screamed in pain. On one occasion, defendant placed ice cubes "on" her vagina and then had intercourse despite Hamblen's protests of pain. On another occasion, when Hamblen acceded to defendant's request to have intercourse on a bathroom floor, defendant would not stop the encounter when Hamblen told him her back was hurting. Defendant put soap on his penis before having sexual intercourse because "he was told that it would kill sperm." He did not stop this practice when told it caused painful burning. He once struck Hamblen on the face. Defendant put posters of naked women over his headboard during intercourse and said he had advertised himself in pornography magazines. When Hamblen was diagnosed with a kidney infection, defendant flushed her medication down the toilet because his mother had told him the medicine was "no good."

D. testified she met defendant 10 years earlier, when she was 13 years old. She eventually became defendant's girlfriend and described their relationship

as "mostly sexual." Defendant was obsessed with cleanliness. When they had sex in motels, he would lay towels on the bed to avoid leaving any stains. D. recalled that defendant described prostitutes as "dirty and disgusting." He told her "they shouldn't be here," "they shouldn't exist," and "somebody should remove them." D. said defendant collected guns and often showed them to her. He bragged that he had mob connections and could get guns any time he wanted. He showed D. photographs of people he claimed to have killed. When she was homeless, D. accepted defendant's invitation to use the shower in his apartment. He then forced her to have sexual intercourse with him. She reported this incident to police but received no response to her followup inquiries. During this incident and others, defendant put soap on his penis as a method of birth control.

Prostitute Chavez testified that defendant twice approached her on the street between July and September 1995 soliciting sex. She declined his proposition because she felt "funny" about him.

On appeal, defendant argues the trial court erroneously admitted the above prosecution rebuttal evidence, contending the evidence was irrelevant and inadmissible under Evidence Code sections 352, 1101, and 1102. We review a trial court's evidentiary rulings under these code sections for abuse of discretion. (*People v. Harris* (2005) 37 Cal.4th 310, 335 [33 Cal.Rptr.3d 509, 118 P.3d 545]; *People v. Gray* (2005) 37 Cal.4th 168, 202 [33 Cal.Rptr.3d 451, 118 P.3d 496]; *People v. Cole* (2004) 33 Cal.4th 1158, 1195 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

Because defendant objected only that the evidence was irrelevant and unduly prejudicial under Evidence Code section 352, he has forfeited his claim that the trial court admitted this evidence in violation of Evidence Code sections 1101 and 1102.[31] (*People v. Thomas* (1992) 2 Cal.4th 489, 520 [7 Cal.Rptr.2d 199, 828 P.2d 101].) This claim is also without merit.

The prosecution's rebuttal evidence was properly admitted to attack the basis of Dr. Terrell's testimony. (Evid. Code, §§ 721, subd. (a), 780.) It was relevant to the jury's determination of the weight and credibility of his opinion. (See, e.g., *People v. Smithey* (1999) 20 Cal.4th 936, 965–966 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [the rebuttal testimony of a prosecution expert critical of forensic psychiatry and of the opinions of the defense experts was relevant to the weight of those opinions, and its admission was neither improper nor prejudicial]; *People v. Prince* (1988) 203 Cal.App.3d

---

[31] The record does not support defendant's implied assertion that the trial court admitted the prosecution's rebuttal evidence under Evidence Code section 1102, subdivision (b), which permits the admission of evidence of a defendant's character only in the form of opinion or reputation evidence and not evidence of specific acts.

848, 856–858 [250 Cal.Rptr. 154] [the testimony of a prosecution expert was relevant to the weight and credibility of the defense expert opinions on the defendant's competency to stand trial].)

The testimony of the rebuttal witnesses was also properly admitted as direct impeachment of defendant's own testimony. Here, "[b]y taking the stand, defendant put his own credibility in issue and was subject to impeachment in the same manner as any other witness." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139 [124 Cal.Rptr.2d 373, 52 P.3d 572]; see Evid. Code, § 1101, subd. (c).)

Defendant further contends the trial court did not adequately weigh the potential prejudice of the evidence against its probative value under Evidence Code section 352. He specifically complains the court did not consider the inflammatory nature of the uncorroborated testimony he raped D. and mistreated Hamblen. He has forfeited these issues by failing to argue them below. (Evid. Code, § 353, subd. (a); *People v. Holt* (1997) 15 Cal.4th 619, 666–667 [63 Cal.Rptr.2d 782, 937 P.2d 213] [a claim of the erroneous admission of evidence is preserved for appeal if the timely objection to admission of the evidence alerted the trial court to the nature of the anticipated evidence and the basis on which exclusion was sought and afforded the opposing party an opportunity to establish its admissibility]; see also *People v. Marks* (2003) 31 Cal.4th 197, 228 [2 Cal.Rptr.3d 252, 72 P.3d 1222] ["A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal."].)

 Further, "a court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1169 [113 Cal.Rptr.2d 827, 34 P.3d 937].) Our independent review of the record shows the trial court carefully considered defendant's motion and performed the requisite weighing process under Evidence Code section 352. The court heard argument from both sides before it ruled on the rebuttal evidence, finding "under [section] 352, . . . that [its] relevance and materiality . . . outweighs [any] prejudicial effect."

 Contrary to defendant's arguments, none of this testimony was unduly prejudicial. " 'Prejudice' as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant.

The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption ' "substantially outweigh" ' the probative value of relevant evidence, a section 352 objection should fail. (*People* v. *Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635].) ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]' (*People* v. *Karis* (1988) 46 Cal.3d 612, 638 [250 Cal.Rptr. 659, 758 P.2d 1189].) [¶] The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors. [Citation.]" [Citation.]' (*People* v. *Zapien* (1993) 4 Cal.4th 929, 958 [17 Cal.Rptr.2d 122, 846 P.2d 704].) In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." (*Vorse* v. *Sarasy* (1997) 53 Cal.App.4th 998, 1008–1009 [62 Cal.Rptr.2d 164].)

The challenged evidence was directly relevant to impeach defendant's own testimony and that of his witnesses. Although evidence of D.'s rape and Hamblen's mistreatment is unpleasant, it paled in comparison to the testimony from four witnesses that defendant tried to kill them. The jury was properly instructed not to be influenced by passion, sympathy, or prejudice and to conscientiously consider and weigh the evidence in applying the law and reaching its verdict. (CALJIC No. 1.00.)

In the interest of complete review, we note that even if we were to assume evidentiary error, any error would be harmless, whether assessed under the federal constitutional (*Chapman, supra*, 386 U.S. at p. 24) or state (*People v. Watson, supra*, 46 Cal.2d at p. 836) standard of review. There was overwhelming evidence of defendant's guilt.

### D. Asserted Errors Regarding the Testimony of Defendant's Mother and Claims of Prosecutorial Misconduct

Defendant contends that several evidentiary errors and prosecutorial misconduct cumulatively rendered his trial fundamentally unfair and deprived him of due process under the Fifth and Fourteenth Amendments to the United States Constitution. He claims the trial court erred by "forcing" his mother to

invoke her Fifth Amendment right against self-incrimination seven times in front of the jury and by permitting the prosecutor to impeach her with evidence that she had tried to steal from her employer. He argues the prosecutor engaged in misconduct by violating the trial court's order limiting that cross-examination. We reject each claim. Thus, there was no error to accumulate.

### 1. *Defense Witness Donna Doolin Larsen's Trial Testimony and Related Trial Proceedings*

Donna Doolin Larsen testified as an alibi witness for her son. On the night Tucker was murdered, defendant was at home with her, cleaning house, except for a half-hour when he left to buy ice cream. On the night Kachman was shot, defendant spent the evening with Larsen at home.

Before Larsen's cross-examination, the court conducted an in limine hearing. The prosecutor informed the court that he and defense counsel had previously discussed Larsen's potential impeachment. The prosecutor said that if Larsen were to testify for the defense, he would seek to impeach her with evidence she had falsely told police and others that she was a registered nurse, that she had altered her daughter's nursing license for her own use, and that she had been suspected of taking a computer from the school where she worked. The prosecutor argued these specific instances of misconduct were proper impeachment.

Defense counsel insisted that the prosecutor had said he did not intend to impeach Larsen with that information at trial and the defense had relied on that representation in putting Larsen on the stand. The prosecutor asserted no such promise was given. He stated only that he would raise the issue with the court when the defense called Larsen to testify. The court ruled it would allow the impeachment.

After a brief recess, the court reconvened and read to the parties the relevant portion of the reporter's transcript of a related pretrial hearing.[32] The court did not recall any representation by the prosecutor that he would not impeach Larsen with the specific instances described above. The court reminded defense counsel that he did not request a hearing before he brought Larsen into the courtroom and called her as a witness.

---

[32] At a hearing held on March 18, 1996, defense counsel informed the trial court that Larsen had been charged with a misdemeanor for misrepresenting herself as a registered nurse and that if she were asked about the matter while testifying in defendant's trial, she would invoke her Fifth Amendment rights. Counsel then requested a ruling on Larsen's anticipated impeachment based on this charge. The prosecutor indicated he would seek a ruling regarding impeachment if and when defendant called Larsen to testify. The trial court asked the parties to address all issues related to impeachment at a hearing *before* Larson testified.

Counsel informed the court that Larsen would invoke her Fifth Amendment right against self-incrimination if the prosecutor's questions were allowed. He asked that Larsen be permitted to invoke the Fifth Amendment outside the presence of the jury. The trial court denied that request, stating: "The Court is going to deny the motion. *You deliberately brought her in here and asked her questions, and now the District Attorney wants to ask her questions and impeach her, and now you want it all done outside the presence of the jury.*" (Italics added.)

Larsen's own attorney was present and advised Larsen just before the cross-examination. Larsen invoked her Fifth Amendment privilege seven times in response to the prosecutor's questions whether she had ever purposely tried to mislead people, been dishonest, submitted false documents to an employer, submitted a false copy of a nursing license to a school official, altered a nursing license to add her name, used her daughter's nursing license with her name typed on it, or used a business card falsely representing she was a registered nurse.

The prosecutor moved to strike all of Larsen's testimony. Outside the presence of the jury, defense counsel again objected that the prosecutor had said that if Larsen admitted lying he would not question her about specific acts. He recalled that when the prosecutor asked her whether she lied, Larsen responded: "Everyone does, I suppose, everyone does." The court gave counsel an opportunity to find a hearing transcript that supported his claim. No such transcript was ever offered.

The court subsequently ruled defense counsel could not question Larsen on redirect because Larsen's invocation of her Fifth Amendment rights, in effect, limited the scope of prosecutor's cross-examination. The court also denied the prosecutor's motion to strike Larsen's earlier testimony and ruled he could continue to cross-examine her "on other issues." The prosecutor concluded his cross-examination of Larsen the following day.[33]

### 2. *Larsen's Assertion of Her Fifth Amendment Privilege Against Self-incrimination*

Defendant now contends the trial court abused its discretion by compelling Larsen to assert her Fifth Amendment privilege against self-incrimination before the jury. We reject this contention.

The jury may not draw any inference from a witness's invocation of a privilege. (Evid. Code, § 913, subd. (a); *People v. Mincey* (1992) 2 Cal.4th

---

[33] For reasons that do not appear on the record, after the prosecution completed cross-examination, the trial court permitted defense counsel to briefly examine Larsen on redirect.

408, 441 [6 Cal.Rptr.2d 822, 827 P.2d 388].) Upon request, the trial court must so instruct jurors. (Evid. Code, § 913, subd. (b); *People v. Mincey, supra,* 2 Cal.4th at p. 441.) "To avoid the potentially prejudicial impact of having a witness assert the privilege against self-incrimination before the jury, we have in the past recommended that, in determining the *propriety* of the witness's invocation of the privilege, the trial court hold a pretestimonial hearing outside the jury's presence." (*People v. Mincey, supra,* 2 Cal.4th at p. 441, italics added.) Such a procedure makes sense under the appropriate circumstances. If there is a dispute about whether a witness may legitimately rely on the Fifth Amendment privilege against self-incrimination to avoid testifying, that legal question should be resolved by the court. Given the court's ruling and the nature of the potential testimony, the witness may not be privileged to testify at all, or counsel may elect not to call the witness as a matter of tactics.

*Mincey* provides a clear example. There, the defendant sought to call Sandra B. who had also been charged with the murder for which the defendant was on trial. Outside the jury's presence, Sandra invoked the privilege on advice of counsel. The defendant sought to compel her to repeat her invocation before the jury. (*People v. Mincey, supra,* 2 Cal.4th at pp. 440–441.) We held that allowing her to do so would invite the jury to speculate that she, not the defendant, was the murderer. Clearly such speculation is improper. (*Id.* at p. 442; Evid. Code, § 913.)

The situation here is different. Apparently for tactical reasons, the defense decided not to request a *Mincey* hearing before calling Larsen to testify. The court had asked both parties to address Larsen's impeachment and her assertion of the privilege before she testified, but defendant did not do so. Thus the defense knowingly risked Larsen's impeachment and her invocation of the privilege.

As noted, the jury was properly instructed not to draw any inference from Larsen's invocation of her Fifth Amendment privilege. (CALJIC No. 2.25.) We assume they followed that instruction. (*People v. Prince* (2007) 40 Cal.4th 1179, 1295 [57 Cal.Rptr.3d 543, 156 P.3d 1015].)

### 3. *Asserted Trial Court Error in Allowing the Prosecutor to Question Larsen About the Computer Equipment*

The prosecutor also asked Larsen whether she had stolen computer equipment from Duncan Polytechnic High School. Larsen denied doing so but confirmed she had been asked by an administrator if she had taken the equipment. Defendant challenged the propriety of this impeachment.

During the in limine hearing, the prosecutor sought a ruling on the admissibility of the theft evidence. One night a witness saw Larsen and

someone else take computer equipment from the school and load it into their car. A few days later the witness saw Larsen return the equipment around 6:00 a.m. The prosecutor directly addressed Evidence Code section 352 in arguing the question. The trial court ruled the prosecutor could question Larsen on this issue.

 On appeal, defendant acknowledges that, under *People v. Wheeler* (1992) 4 Cal.4th 284, 292–293 [14 Cal.Rptr.2d 418, 841 P.2d 938], the court has broad discretion to admit acts of moral turpitude to impeach a witness's credibility. "[I]mpeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, [under Evidence Code section 352,] courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*People v. Wheeler, supra,* 4 Cal.4th at pp. 296–297.) A court also may consider issues of "fairness, efficiency, and moral turpitude" when evidence other than a felony conviction is proffered for impeachment. (*Id.* at p. 297, fn. 7.) Defendant complains the court failed to weigh the pertinent *Wheeler* factors.

Larsen's theft was relevant to the issue of her credibility. At the hearing discussed above, counsel directly addressed Evidence Code section 352 in his argument. The record makes clear that the trial court was aware of and performed its duties in that regard.

Further, the trial court instructed the jury as follows: "Evidence has been introduced for the purpose of showing that a witness engaged in past criminal conduct amounting to a misdemeanor. Such evidence may be considered by you only for the purpose of determining the believability of that witness. The fact that the witness engaged in past criminal conduct amounting to a misdemeanor, *if it is established*, does not necessarily destroy or impair a witness' believability. It is one of the circumstances that you may take into consideration in weighing the testimony of such witness." (CALJIC No. 2.23.1, italics added.) We presume the jury followed this instruction.

> 4. *Asserted Prosecutorial Misconduct in Questioning Larsen About Other Instances of Falsely Representing Herself as a Registered Nurse*

The prosecutor asked Larsen, in several ways, whether she had falsely presented herself as a registered nurse. Larsen asserted her Fifth Amendment privilege seven times in response to those questions. Larsen's attorney objected that the questioning was cumulative. Defendant's counsel joined in the objection, which the trial court sustained. The prosecutor then asked

Larsen whether she had written a letter in October 1995 to Gary Kirby, a program coordinator for the Fresno Unified School District. After the trial court sustained Larsen's attorney's objection on the ground the question was cumulative, the prosecutor asked Larsen whether she had written a letter to John Lockey, another district employee, in May 1993. Larsen's attorney objected and asked that similar questions be disallowed in light of the court's ruling. The court sustained this objection and asked the prosecutor if he had other questions.

■■■ On appeal, defendant contends the prosecutor's posing of these two questions was misconduct. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44 [104 Cal.Rptr.2d 582, 18 P.3d 11]; accord, *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [91 L.Ed.2d 144, 106 S.Ct. 2464]; *Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643 [40 L.Ed.2d 431, 94 S.Ct. 1868].) Under California law, a prosecutor who uses deceptive or reprehensible methods of persuasion commits misconduct even if such actions do not render the trial fundamentally unfair. (*People v. Cook* (2006) 39 Cal.4th 566, 606 [47 Cal.Rptr.3d 22, 139 P.3d 492].) Generally, a claim of prosecutorial misconduct is not cognizable on appeal unless the defendant made a timely objection and requested an admonition. (*Ibid.*) Here, although defendant preserved this claim to the extent he joined in the objections by Larsen's attorney, defendant failed to request an admonition. In any event, we conclude the prosecutor did not engage in misconduct by asking Larsen the above questions.

Each of the prosecutor's questions related to factually distinct circumstances in which Larsen allegedly held herself out as a registered nurse. The prosecutor had not addressed these factual circumstances in any of his previous questions. Neither question involved the prosecutor's use of deceptive or reprehensible methods in an attempt to improperly influence the jury on any material issue. These questions went unanswered. The jury was instructed that neither statements nor questions by attorneys constituted evidence and that it should not speculate about the answer a witness might have given to a question to which an objection was sustained. We presume the jury followed the court's instructions and ignored the above questions. (*People v. Prince, supra*, 40 Cal.4th at p. 1295.)

### 5. *Asserted Prosecutorial Misconduct in Closing Argument*

During his closing argument, the prosecutor told the jury that "[a] matter of general or common knowledge is that at the time of final argument [defense counsel] cries, so when that happens—." The trial court overruled counsel's

objection to his remark. The prosecutor continued: "When that happens, I want you to understand that it's nothing unique to this case."

Defendant contends that the prosecutor improperly referred to "facts not in the record" and attacked the integrity of defense counsel by suggesting he "was a dishonest charlatan, an attorney without integrity, who would resort to theatrical gestures to sway a jury."

The prosecutor's brief remark was harmless, and jurors were instructed that the statements of counsel were not evidence. They were also instructed that they must not be influenced by sentiment, sympathy, passion or prejudice. We presume the jury followed these instructions, ignored the prosecutor's remark, along with any displays of "sentiment" and "passion" by counsel, and decided the case based on the evidence admitted at trial.

### 6. *Cumulative Effect*

Having rejected defendant's claims, we reject his assertion of cumulative error.

### E. *Admissibility of DNA Evidence*

Defendant contends that the DNA test results on samples from the Espinoza autopsy were erroneously admitted in violation of the standard enunciated in *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*). Under *Kelly*, the proponent of evidence derived from a new scientific technique must establish that (1) the reliability of the new technique has gained general acceptance in the relevant scientific community, (2) the expert testifying to that effect is qualified to give an opinion on the subject, and (3) the correct scientific procedures were used. (*Id.* at p. 30.)

Defendant concedes that under *Kelly*, the polymerase chain reaction (PCR) DQ-Alpha testing method used in this case is generally accepted in the relevant scientific community. He asserts, however, that the dot-intensity analysis relied upon by the prosecution's expert is a separate testing method, and because the trial court did not separately rule that the dot-intensity method was valid under *Kelly*, the DNA test results were inadmissible. We need not determine whether the dot-intensity analysis was subject to exclusion under *Kelly*, because its admission was harmless in any event. We reject defendant's additional contention that the prosecution's population frequency statistics were inadmissible without proof of the perpetrator's ethnicity.

### 1. Procedural Background

#### a. Kelly hearing

The court held a *Kelly* hearing to consider the DNA test results. The prosecution elicited extensive testimony from state Department of Justice (DOJ) criminalists Rodney Andrus and Edwin Scruggs about the PCR DQ-Alpha method and its general acceptance in the scientific community. PCR DQ-Alpha testing is a subtype of PCR DNA testing methods that tests a single genetic marker. (See also *People v. Henderson* (2003) 107 Cal.App.4th 769, 777 [132 Cal.Rptr.2d 255].) Neither of the prosecution's experts discussed "dot-intensity analysis" during the *Kelly* hearing, but Andrus did give his preliminary conclusion that that defendant was a possible contributor of the DNA samples obtained from Espinoza.[34]

Counsel argued the results should be excluded under Evidence Code section 352 on the grounds the PCR DQ-Alpha test method was unreliable and would confuse the jury because the results could not identify an individual as a source of the DNA tested but could only include an individual in a group of potential sources.

Relying on *People v. Morganti* (1996) 43 Cal.App.4th 643, 671 [50 Cal.Rptr.2d 837], the trial court found that PCR DQ-Alpha testing is generally accepted in the relevant scientific community and no significant controversy exists with respect to its reliability. The court also found the prosecution's experts "were eminently qualified" and employed the correct scientific procedures. In rejecting defendant's argument under Evidence Code section 352, the court found the probative value of the method was not so undermined by any limitation that the results should be excluded.

#### b. DNA evidence introduced at trial

Again at trial, Andrus gave his qualifications and testified about both blood and DNA testing. He described the PCR DQ-Alpha method, which tests for the presence or absence of the six common identifiable alleles at the DQ-Alpha genetic marker, denominated as 1.1, 1.2, 1.3, 2, 3, and 4. Andrus explained that an individual's genotype for the DQ-Alpha marker is composed of a pair of alleles. The six DQ-Alpha alleles can be paired to form 21 distinct genotypes, meaning the human population can be divided into 21 population groups. Ultimately, the DQ-Alpha genotype of the sample is

---

[34] Andrus explained that his conclusions were considered preliminary and not final or "verified" by DOJ standards because he had not yet completed the required documentation of the tests he conducted. We note that the final test results Andrus subsequently provided at trial were consistent with the preliminary test results he provided at the *Kelly* hearing.

determined by the presence of blue dots on test strips that indicate an allele of the sample DNA bonded with a specific DNA sequence or "primer" on the test strip.

The DNA found in the fingernail scrapings and vaginal sample taken from Espinoza revealed sperm from more than one individual (i.e., mixed sperm samples). Andrus performed PCR DQ-Alpha tests on these samples as well as on DNA obtained from defendant's blood. Because the samples from Espinoza contained mixed sperm, Andrus used dot-intensity analysis to identify the genotype of the "primary alleles represented"[35] in these samples. Andrus briefly described dot-intensity analysis as a visual comparison of the "relative dot intensity" of the blue color that developed on the dots of the test strips with the mixed DNA sample. A "minor" contributor to the mixed DNA sample, for example, has "significantly less" color intensity than that of a "major" contributor.

Based on these dot-intensity analyses, Andrus determined that the DQ-Alpha genotypes of defendant and the primary contributor of each of the mixed sperm DNA samples were the same. Andrus concluded that defendant could not be eliminated as a possible contributor of these samples. He eliminated defendant as the source of the semen extracted from the condom found near Espinoza's body.

### 2. *Applicable Law*

Whether a new scientific technique has gained general acceptance is a mixed question of law and fact. (*People v. Reilly* (1987) 196 Cal.App.3d 1127, 1134 [242 Cal.Rptr. 496].) "[W]e review the trial court's determination with deference to any and all supportable findings of 'historical' fact or credibility, and then decide as a matter of law, based on those assumptions, whether there has been general acceptance." (*Id.* at p. 1135.) Once a published appellate decision has affirmed admission of a scientific technique, the technique's general acceptance is established as a matter of law. Further hearings on general acceptance are unnecessary "at least until new evidence is presented reflecting a change in the attitude of the scientific community." (*Kelly, supra,* 17 Cal.3d at p. 32; see *People v. Bolden* (2002) 29 Cal.4th 515, 545 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

The trial court's determination on the qualifications of an expert is reviewed for abuse of discretion (*Kelly, supra,* 17 Cal.3d at p. 39) as is its ruling on the use of correct scientific procedures in the particular case (*People v. Venegas* (1998) 18 Cal.4th 47, 91 [74 Cal.Rptr.2d 262, 954 P.2d 525]).

---

[35] Andrus also referred to the "primary alleles represented" interchangeably as "primary contributors" to, or "major components" of, the sample DNA.

### 3. *Discussion*

#### a. *Dot-intensity analysis*

Defendant does not dispute that *People v. Morganti, supra*, 43 Cal.App.4th at page 669, published just before his trial began, established that the PCR DQ-Alpha method has gained general acceptance as a reliable technique. (See also *People v. Wright* (1998) 62 Cal.App.4th 31, 41 [72 Cal.Rptr.2d 246].) Instead, he argues that the dot-intensity analysis that criminalist Andrus used was a new scientific technique, requiring independent proof of general acceptance.

Defendant did not object to Andrus's testimony about dot-intensity analysis at trial and has forfeited his appellate challenge to this evidence. (Evid. Code, § 353 [an objection to the admission of evidence must be timely and clearly specify the basis of the objection]; see also *People v. Geier* (2007) 41 Cal.4th 555, 610–611 [61 Cal.Rptr.3d 580, 161 P.3d 104] [defendant's failure to timely object to the admissibility of the population frequency statistics associated with the DNA test results forfeited the issue on appeal]; *People v. Ochoa* (1998) 19 Cal.4th 353, 414 [79 Cal.Rptr.2d 408, 966 P.2d 442] [a failure to object at trial to the admission of evidence under *Kelly* forfeits the claim for appeal]; *People v. Coleman* (1988) 46 Cal.3d 749, 776–778 [251 Cal.Rptr. 83, 759 P.2d 1260] [an objection to the expert's selection of the test used to analyze semen samples did not preserve defendant's challenge to the expert's conclusions concerning the statistical significance of the test results].)

Whether "dot-intensity analysis" is a novel technique requiring its own proof of general acceptance has not been addressed in a California published opinion.[36] Assuming, without deciding, the results of the dot-intensity analysis were erroneously admitted in this case, the error would have been harmless in light of the overwhelming and uncontradicted evidence of defendant's guilt. In particular, with regard to the Espinoza murder, undisputed ballistics evidence established the victim was killed by a bullet shot from defendant's gun. There is no reasonable probability the verdict would have been more favorable to defendant had the DNA evidence been excluded. (*People v. Watson, supra*, 46 Cal.2d at p. 836.)

---

[36] The Court of Appeal, in dicta, has recognized criticism of dot-intensity analysis. (*People v. Pizarro* (2003) 110 Cal.App.4th 530, 618–620 [3 Cal.Rptr.3d 21], quoting *State v. Harvey* (1997) 151 N.J. 117 [699 A.2d 596] (dis. opn. of Handler, J.) [questioning the validity of dot-intensity analysis as a scientific method], disapproved on another ground by *People v. Wilson* (2006) 38 Cal.4th 1237, 1250–1251 [45 Cal.Rptr.3d 73, 136 P.3d 864].)

b. *Population statistics*

Andrus also testified that, based on the relevant population frequency statistics for the primary contributor to the mixed samples in this case, the donor could have come from 7 percent of the African-American population, 10 percent of the Caucasian population, including defendant, or 20 percent of the Hispanic population. (See *People v. Venegas, supra*, 18 Cal.4th at p. 63 [identification as a possible source of the sample DNA "places the suspect within a class of persons from whom the sample could have originated"].) Andrus explained the number of possible DNA contributors could be reduced by excluding the percentage of females in each group, as well as adult males not present in Fresno at the time of Espinoza's murder, and prepubescent males.

Defendant first complains the statistics were inadmissible because Andrus presented statistics for only the genotype of the primary alleles represented in the mixed samples rather than all alleles in the samples. But this claim, in essence, is premised upon the argument that the dot-intensity technique improperly focused only on the primary contributor in the mixed samples. As noted, defendant forfeited any such argument by failing to raise the issue at trial, and any assumed error was harmless.

Second, defendant contends that, even if Andrus correctly identified the DQ-Alpha genotype of the primary contributor, the DNA evidence should have been excluded because the population frequency statistics were irrelevant without proof of the perpetrator's ethnicity. Again, defendant failed to object on this ground at trial and has forfeited this issue for appeal. (Evid. Code, § 353; *People v. Geier, supra*, 41 Cal.4th at pp. 610–611.) The claim is also meritless. The prosecution in this case presented DNA frequency statistics for the African-American, Caucasian, and Hispanic population groups. Since defendant's trial, we have concluded that expert testimony on DNA profiling frequencies for these specific population groups is admissible even in the absence of independent evidence of the perpetrator's ethnicity. (*People v. Wilson, supra*, 38 Cal.4th at pp. 1249–1250, disapproving to the extent inconsistent *People v. Pizarro, supra*, 110 Cal.App.4th 530.) Even assuming the population frequency statistics were erroneously admitted, any error was harmless in light of the other weighty evidence of defendant's guilt. (See *People v. Venegas, supra*, 18 Cal.4th at p. 93, citing *People v. Watson, supra*, 46 Cal.2d at p. 836; *People v. Pizarro, supra*, 110 Cal.App.4th at p. 634.)

## III. Penalty Phase Issues

### A. Denial of Request for Continuance

The jury returned its guilty verdicts on Tuesday, May 7, 1996. The penalty phase was to begin on Thursday, May 16, 1996. The parties had until Friday, May 10, 1996, to complete penalty phase discovery.

On Monday, May 13, 1996, defense counsel moved for the release of DNA evidence for retesting and for a 48-day continuance under section 1050. Counsel claimed retesting was necessary because it might eliminate defendant as a source. Counsel estimated the testing alone would take about four weeks. The continuance would permit counsel time to interview the prosecution penalty phase witnesses. Counsel admitted he had not contacted any of defendant's 16 potential character witnesses but said he would obtain their telephone numbers and might contact them. Counsel was concerned that these individuals might not testify as defendant anticipated and that he would have to consult with defendant before calling them to testify. The trial court denied both motions.

On appeal, defendant claims the trial court abused its discretion in denying his motion to continue and thereby deprived him of due process, effective assistance of counsel, and a reliable penalty verdict under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. We disagree.

■ A continuance in a criminal case may be granted only for good cause. (§ 1050, subd. (e).) Whether good cause exists is a question for the trial court's discretion. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) The court must consider " ' "not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion." ' " (*Ibid.*) While a showing of good cause requires that both counsel and the defendant demonstrate they have prepared for trial with due diligence (*ibid.*), the trial court may not exercise its discretion "so as to deprive the defendant or his attorney of a reasonable opportunity to prepare." (*People v. Sakarias* (2000) 22 Cal.4th 596, 646 [94 Cal.Rptr.2d 17, 995 P.2d 152].)

A reviewing court considers the circumstances of each case and the reasons presented for the request to determine whether a trial court's denial of a continuance was so arbitrary as to deny due process. (*People v. Frye, supra,* 18 Cal.4th at p. 1013.) Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1126 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

Here, there was no abuse of discretion. Defendant's request rested, in large part, on his claim that new test results might provide exculpatory evidence. Retesting DNA would not have been beneficial to defendant, however, in light of the extensive evidence linking him to each crime and, specifically, uncontroverted ballistics evidence establishing Espinoza was killed by a bullet fired from defendant's gun. Defendant had long been on notice of the existence of the DNA evidence and the district attorney's intent to use it. In addition, the evidence showed that defendant actually engaged in intercourse with only one of his six victims. During that encounter, he wore a condom. Even if he were excluded as one of the multiple semen donors, the evidence would have had little impact. Although the prosecutor did present DNA evidence, he ultimately invited the jury to reject it if they were in doubt as to its significance because the remaining evidence pointed convincingly to defendant's guilt. Under these circumstances, the 48-day continuance requested by defendant was both untimely and unlikely to affect the outcome of the proceedings. The trial court did not abuse its discretion in denying the continuance.

With respect to defendant's requested continuance to interview prospective witnesses, defendant made only a general assertion in his written motion that he needed more time to prepare a defense to the prosecution's case in aggravation. Counsel provided no explanation why he could not prepare such a defense or interview the prosecution's prospective witnesses in the six days leading up to the penalty phase.[37] As previously discussed, defense counsel had given a tactical reason to delay interviews of defendant's potential character witnesses. In addition, for the first time on appeal, defendant speculates that a continuance might have allowed him time to develop childhood abuse issues that Dr. Hedberg mentioned in testifying on his behalf at the penalty phase. But he made no showing that he could produce specific, relevant mitigating evidence within a reasonable time. (*People v. Jenkins, supra,* 22 Cal.4th at p. 1038.) Certainly defendant and his defense team were aware of whether such evidence existed. They were in contact with defendant's close relatives. The defense provided no insight into why any such extant evidence had not been shared with Dr. Hedberg. In sum, defendant's vague and speculative reasons for the continuance failed to support a showing of good cause. The court was within its discretion in refusing to grant a continuance.

---

[37] Four witnesses testified for the prosecution at the penalty phase: the nurse who examined D. following her alleged rape; a criminalist who testified about the hydroshock hollow-point bullets used in the shootings; the daughter of murder victim Inez Espinoza; and the sister of murder victim Peggy Tucker.

### B. Faretta *Motion*

On May 21, 1996, the jury returned a death verdict. Defendant contends that the trial court erroneously denied his request for self-representation under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], made at his sentencing hearing on June 18, 1996. The motion was untimely.

#### 1. *Procedural background*

On the day scheduled for sentencing, June 18, 1996, defendant moved for the substitution of counsel pursuant to *People v. Marsden, supra,* 2 Cal.3d 118, and for a two-week continuance.[38] Immediately after both motions were denied, defendant asked to represent himself and also to have "an assistant to prepare a motion for new trial, motion for reduction of sentence." The court responded: "In effect what you're asking is to represent yourself and have this Court do exactly what it denied you already, that is, a *Marsden* motion to relieve your attorney and appoint a new attorney. You're not going to come in the back door." When defendant repeated his request to relieve defense counsel and have an assistant appointed to prepare motions, the trial court denied his requests.

The court then asked defendant if he knew what a motion for new trial was. Defendant answered it was a motion to point out "differences that should have been dealt with differently and [to] bring [those] to the attention of the court and also try to enter any new evidence that might open the court's eyes and allow for a new trial." When the trial court questioned whether defendant had any new evidence, defendant said, "Not at this exact moment, but maybe in a period of time, yes." The court asked if defendant could find any new evidence over the next two weeks, and defendant responded, "I can assure the Court that, yes, there are still things that need to be done that could be presented to the Court in fact of, yes, new evidence."

The court asked defendant about his education and learned that defendant dropped out of high school and had obtained a high school general education development (GED) certificate while in custody. The court additionally noted "there is some evidence that you were a slow learner" and defendant agreed.

The court also inquired about how defendant would address a motion for new trial and motion for reduction of penalty. Defendant essentially stated he would first address the jury's "conduct" and then present evidence that he had never been in trouble with the law, had always held a job, and had obtained

---

[38] The trial court had denied defendant's two previous attempts to substitute counsel under *Marsden,* one made during the guilt phase trial, on April 3, 1996, and the other on the day the penalty phase began, May 16, 1996. He does not challenge these rulings on appeal.

letters of recommendation from employers when applying to new jobs. Defendant added he would submit letters from his family and friends providing their impressions of him.

The court then advised defendant that if his motion were granted, he could not complain on appeal that he was inadequate to represent himself. Defendant said he understood and was asking for an "assistant" to "draw up that way different timelines . . . to propose to the Court" for his motions. The court informed defendant that if it permitted him to represent himself, it did not have to grant a continuance and asked whether defendant was ready to proceed that day. Defendant said he was not ready and needed a continuance to "draw up the proper papers and also present the Court with my findings. . . ."

The court then ruled as follows: "Well, the Court is very concerned and going to deny your *Faretta* motion to permit you to represent yourself on the basis that the Court feels that you are not adequate to represent yourself, that is, the evidence during the course of the trial was that you did not finish high school, that—and that by itself is not the reason, but you were described as being a slow learner and that you had problems in school. And the Court is not going to grant you a continuance in order for you to prepare to represent yourself. Therefore, the Court is going to deny your motion to represent yourself." (Italics added.)

### 2. *Discussion*

■ A criminal defendant has a constitutional right to counsel at all critical stages of a criminal prosecution, including sentencing. (*Mempa v. Rhay* (1967) 389 U.S. 128, 134–137 [19 L.Ed.2d 336, 88 S.Ct. 254]; *People v. Dunkle, supra,* 36 Cal.4th at p. 930.) The right to counsel may be waived by a criminal defendant who elects to represent himself at trial. (*Faretta v. California, supra,* 422 U.S. at pp. 807, 834–835.) The right of self-representation is absolute, but only if a request to do so is knowingly and voluntarily made and if asserted a reasonable time before trial begins. Otherwise, requests for self-representation are addressed to the trial court's sound discretion. (*People v. Windham* (1977) 19 Cal.3d 121, 127–129 [137 Cal.Rptr. 8, 560 P.2d 1187].) Moreover, whether timely or untimely, a request for self-representation must be unequivocal. (*People v. Marshall* (1997) 15 Cal.4th 1, 22–23 [61 Cal.Rptr.2d 84, 931 P.2d 262].)

On appeal, a reviewing court independently examines the entire record to determine whether the defendant knowingly and intelligently invoked his right to self-representation. (*People v. Stanley* (2006) 39 Cal.4th 913, 932 [47 Cal.Rptr.3d 420, 140 P.3d 736].)

As a preliminary matter, we agree with the parties that the trial court incorrectly referred to defendant's educational background and evidence that he was a "slow learner" in denying defendant's request for self-representation. Following United States Supreme Court precedent in *Godinez v. Moran* (1993) 509 U.S. 389, 399–400 [125 L.Ed.2d 321, 113 S.Ct. 2680], we have held that a trial court may not measure a defendant's competence to waive his right to counsel by evaluating the defendant's "technical legal knowledge" (*People v. Dunkle, supra*, 36 Cal.4th at p. 908) or his ability to represent himself (*People v. Welch* (1999) 20 Cal.4th 701, 733 [85 Cal.Rptr.2d 203, 976 P.2d 754]). The right to self-representation may be invoked by any defendant competent to stand trial. (*People v. Dunkle, supra*, 36 Cal.4th at p. 908.)

The trial court's remarks, however, also touch on its legitimate concern that defendant's request was untimely and would needlessly delay the proceedings. The timeliness requirement "serves to prevent a defendant from misusing the motion to delay unjustifiably the trial or to obstruct the orderly administration of justice." (*People v. Horton* (1995) 11 Cal.4th 1068, 1110 [47 Cal.Rptr.2d 516, 906 P.2d 478].) Here, defendant argues that his motion was timely because defense counsel's performance was inadequate throughout trial, the two-week continuance he requested was not unreasonable, and granting self-representation for sentencing would not inconvenience the jury.

"We have held that, for purposes of assessing the timeliness of a motion for self-representation, the guilt and penalty phases in a capital prosecution are not separate trials but parts of a single trial, and a motion made between the guilt and penalty phases is thus untimely and subject to the trial court's discretion." (*People v. Mayfield* (1997) 14 Cal.4th 668, 810 [60 Cal.Rptr.2d 1, 928 P.2d 485]; see *People v. Hardy* (1992) 2 Cal.4th 86, 193–195 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People v. Halvorsen* (2007) 42 Cal.4th 379, 434 [64 Cal.Rptr.3d 721, 165 P.3d 512] [capital defendant's motion for self-representation brought seven months before jury selection in the penalty retrial was timely].) We have not addressed, however, the timeliness of a request for self-representation made after the penalty phase verdict. (See *Mayfield, supra*, 14 Cal.4th at p. 810 [declining to decide whether a post-penalty-phase *Faretta* motion would be timely if made "a 'reasonable time' before sentencing"].) We need not do so here.

Defendant's request was manifestly untimely. He never requested self-representation during the guilt or penalty phase. He appeared on the day set for sentencing and sought, not to act as his own counsel, but to replace his appointed lawyer with a new one and to secure a continuance. Only when this approach failed did defendant seek self-representation, and only then with the appointment of an assistant to actually draft his moving papers. Defendant

had no new evidence to support the motion for new trial he intended to file. When pressed on the question of new evidence, defendant answered vaguely that "there are still things that need to be done that could be presented to the Court." Defendant provided no specific information about any new evidence he expected to find, when he expected to find it, or how long he might need to prepare his motions. He was not prepared to proceed and could not provide a reasonable estimate of when he would be ready. The trial court's ruling was well within the scope of its discretion.[39]

## C. Challenges to California's Death Penalty Law

Defendant challenges California's death penalty law on various grounds we have repeatedly rejected. He offers no persuasive reason to reconsider our prior decisions. We continue to hold:

Section 190.2 does not unconstitutionally fail to narrow the class of persons eligible for the death penalty. (*People v. Chatman* (2006) 38 Cal.4th 344, 410 [42 Cal.Rptr.3d 621, 133 P.3d 534].) Section 190.3, factor (a), permitting the penalty phase jury to consider the circumstances of the offense and the existence of any special circumstances, is neither vague nor overbroad, and does not unconstitutionally permit arbitrary and capricious imposition of the death penalty. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1165 [40 Cal.Rptr.3d 118, 129 P.3d 321].) "The jury may properly consider evidence of unadjudicated criminal activity involving force or violence under factor (b) of section 190.3 . . . ." (*People v. Brown* (2004) 33 Cal.4th 382, 402 [15 Cal.Rptr.3d 624, 93 P.3d 244].)

Neither the state nor federal Constitution requires the jury to make written findings or agree unanimously as to specific aggravating circumstances.

---

[39] The circumstances of defendant's posttrial request for self-representation are in stark contrast to a recent Court of Appeal decision that held such a motion in a noncapital case is timely if made "a reasonable time prior to commencement of the sentencing hearing." (*People v. Miller* (2007) 153 Cal.App.4th 1015, 1024 [62 Cal.Rptr.3d 900].) In *Miller*, the defendant moved for self-representation after the jury rendered its verdict and a new trial motion was made and denied, but more than two months before the scheduled sentencing hearing. At the time he made his motion, the defendant indicated to the court he planned to conduct his own investigation and that he would be prepared on the date the court had set. (*Id.* at pp. 1020, 1024.) In holding the trial court erred by denying the defendant's motion as untimely, the court observed that concerns about trial delay or disruption do not apply to separate sentencing hearings. (*Id.* at p. 1024.) Because the defendant's request was timely, he "had an absolute right to represent himself at sentencing and the trial court was required to grant his request for self-representation, which was unequivocal, as long as he was mentally competent and the request was made 'knowingly and intelligently, having been apprised of the dangers of self-representation.' " (*Ibid.*, quoting *People v. Welch, supra,* 20 Cal.4th at p. 729.) In this case, for the reasons stated, defendant's right to self-representation at sentencing was not absolute but subject to the court's discretion.

(*People v. Morrison* (2004) 34 Cal.4th 698, 730 [21 Cal.Rptr.3d 682, 101 P.3d 568].) Nor is California's death penalty law unconstitutional for failing to require proof beyond a reasonable doubt or by a preponderance of the evidence "as to the existence of aggravating circumstances, the greater weight of aggravating circumstances over mitigating circumstances, or the appropriateness of a death sentence." (*People v. Brown, supra*, 33 Cal.4th at p. 401.) Therefore, the trial court here did not err by not instructing on burden of proof. (*People v. Perry* (2006) 38 Cal.4th 302, 321 [42 Cal.Rptr.3d 30, 132 P.3d 235].) The United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531], do not require us to alter these conclusions. (*People v. Howard* (2008) 42 Cal.4th 1000, 1031 [71 Cal.Rptr.3d 264, 175 P.3d 13].)

The trial court is not constitutionally required to instruct the jury that certain sentencing factors are relevant only to mitigation. (*People v. Panah, supra*, 35 Cal.4th at p. 499.) The use of the phrase "whether or not" in certain statutory factors (e.g., § 190.3, factor (d), "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance") does not unconstitutionally suggest "that the absence of such factors amount[s] to aggravation." (*People v. Kraft* (2000) 23 Cal.4th 978, 1079 [99 Cal.Rptr.2d 1, 5 P.3d 68].) The use of certain adjectives (i.e., "extreme" and "substantial") in the list of sentencing factors neither acts as a barrier to the jury's consideration of mitigation facts nor renders the statute unconstitutional. (*People v. Panah, supra*, 35 Cal.4th at p. 500.)

"Intercase proportionality review is not constitutionally required. [Citation.] Nor does equal protection require that capital defendants be afforded the same sentence review afforded other felons under the determinate sentencing law." (*People v. Dunkle, supra*, 36 Cal.4th at p. 940.)

### D. *International Law*

Defendant contends that California's death penalty violates international law. Specifically, he argues California's use of capital punishment "as regular punishment for substantial numbers of crimes—as opposed to extraordinary punishment for extraordinary crimes," violates international norms of human decency and hence, the Eighth and Fourteenth Amendments to the United States Constitution. We have rejected these arguments before and do so again.

"International law does not compel the elimination of capital punishment in California." (*People v. Snow* (2003) 30 Cal.4th 43, 127 [132 Cal.Rptr.2d 271, 65 P.3d 749].) Moreover, California does not impose capital punishment as

" '*regular punishment* for substantial numbers of crimes.' " (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43 [45 Cal.Rptr.3d 407, 137 P.3d 229].) "The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to 'regular punishment' for felonies. (E.g., Cal. Const., art. VI, § 11; §§ 190.1–190.9, 1239, subd. (b).)" (*Id.* at p. 44.)

## IV. DISPOSITION

The judgment is affirmed.

George, C. J., Baxter, J., Chin, J., and Moreno, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—In this capital case, the County of Fresno agreed to pay the fees of the appointed defense attorney. Under the contract, counsel received an $80,000 flat fee that included $60,000 for defense expenses; counsel was allowed to keep any of the money not spent. The contract thus had a built-in incentive for counsel to spend as little as possible on the defense so he could pocket more money. That is what happened here, where counsel spent less than 20 percent of the money allocated for defense expenses, keeping the remaining funds for himself.

One cannot tell from the record whether there were reasonable tactical decisions justifying defense counsel's small expenditures and minimal efforts to prepare for the *guilt phase* of trial. Therefore, I join the majority in rejecting defendant's claim that his right to counsel was violated at the guilt phase; defendant may, of course, raise that claim again in a habeas corpus petition, relying on evidence outside the appellate record.

With respect to the *penalty phase*, however, the record shows that there was no tactical justification for counsel's substandard preparations. Consequently, unlike the majority, I am of the view that the fee agreement in question violated defendant's right to counsel, thus requiring reversal of the sentence of death.

### I

Defendant was charged in Fresno County with two counts of murder and four counts of attempted murder, as well as special circumstances that made him eligible for the death penalty. Initially the Fresno County Public Defender represented him, but when the public defender declared a conflict of interest, the trial court appointed Attorney Rudy Petilla to represent defendant.

To obtain the appointment, the attorney filled out a form entitled "Proposal Setting Compensation," in which he requested a fee of $80,000; at the time, that was the amount Fresno County paid for "Category 3" cases—those with multiple victims or defendants, highly unusual publicity, complicated special circumstances, or complex factual or legal issues. The attorney estimated total defense expenses at $60,000 ($40,000 for investigation and $20,000 for expert witnesses), leaving the remaining $20,000 as his fee. The county agreed.

Counsel represented defendant at the guilt and penalty phases of the capital trial. But instead of spending the estimated $60,000 on the defense, he spent less than $9,000, keeping the remaining $71,000 of the $80,000 Fresno County had paid him.

## II

Defendant contends the fee agreement between his trial counsel and Fresno County gave rise to a conflict of interest that violated his right to counsel under article I, section 15 of the state Constitution.

"The right to effective assistance of counsel, secured by the Sixth Amendment to the federal Constitution, and article I, section 15 of the California Constitution, includes the right to representation that is free from conflicts of interest." (*People v. Cox* (2003) 30 Cal.4th 916, 948 [135 Cal.Rptr.2d 272, 70 P.3d 277].)

"Although the *federal* Constitution . . . requires proof of an actual conflict of interest, that is, proof that counsel's conflict adversely affected his or her performance during the proceedings [citation], under the *state* Constitution we have required only that the record support an 'informed speculation' that a 'potential conflict of interest' impaired the defendant's right to effective assistance of counsel. [Citations.] Because a conflict of interest may retard counsel's development of evidence or arguments in support of the defense . . . we have retained this stricter standard in order to 'closely guard' the fundamental right to the assistance of counsel. 'The very failure to produce or emphasize such information . . . produces a void and results in a record which shields the fact of any possible conflict and makes it difficult to demonstrate on appeal that a conflict did in fact exist. [Citation.] Accordingly, a [defendant] . . . need not establish that there was an actual conflict of interest, but rather it is sufficient if the record provides an adequate basis for an "informed speculation" that there was a potential conflict of interest which prejudicially affected the defendant's right to effective counsel.' " (*People v. Rundle* (2008) 43 Cal.4th 76, 174–175 [74 Cal.Rptr.3d 454, 180 P.3d 224], italics added, fn. omitted.)

"Conflicts of interest may arise in various factual settings. Broadly, they 'embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or *by his own interests*.' " (*People v. Jones* (1991) 53 Cal.3d 1115, 1134 [282 Cal.Rptr. 465, 811 P.2d 757], italics added.)

Here, the nature of defense counsel's fee agreement with Fresno County gave him an incentive to spend as little as possible on the defense. Did this create a potential conflict of interest? I explore this question below.

As a general rule, fee agreements do not violate a defendant's right to conflict-free counsel. " '[A]lmost any fee arrangement between attorney and client may give rise to a "conflict." An attorney who received a flat fee in advance would have a "conflicting interest" to dispose of the case as quickly as possible, to the client's disadvantage; and an attorney employed at a daily or hourly rate would have a "conflicting interest" to drag the case on beyond the point of maximum benefit to the client. [¶] The contingent fee contract so common in civil litigation creates a "conflict" when either the attorney or the client needs a quick settlement while the other's interest would be better served by pressing on in the hope of a greater recovery. The variants of this kind of "conflict" are infinite. Fortunately most attorneys serve their clients honorably despite the opportunity to profit by neglecting or betraying the client's interest.' " (*Maxwell v. Superior Court* (1982) 30 Cal.3d 606, 618, fn. 8 [180 Cal.Rptr. 177, 639 P.2d 248].)

Occasionally, however, a fee agreement can create a potential conflict of interest. For example, "[c]onflicts may . . . arise in situations in which an attorney undertakes representation of a defendant in exchange for the literary rights to a portrayal or account based on information relating to the representation." (*People v. Bonin* (1989) 47 Cal.3d 808, 836 [254 Cal.Rptr. 298, 765 P.2d 460].) And in *In re Gay* (1998) 19 Cal.4th 771 [80 Cal.Rptr.2d 765, 968 P.2d 476], Justice Werdegar's concurring opinion, which I signed, concluded there was a conflict of interest when trial counsel "engineered his appointment in a capital case, doing so by extraordinary, dishonest means, and for the apparent purpose of quickly obtaining a fee while expending as little time and effort on the case as possible." (*Id.* at p. 833 (conc. opn. of Werdegar, J.).)

The situation here is one of those rare instances in which the fee agreement has created a " 'potential conflict of interest.' " (*People v. Rundle, supra*, 43 Cal.4th at p. 175.) By allowing defense counsel to keep any of the money not spent on defendant's behalf, Fresno County gave counsel a considerable

financial incentive to spend as little as possible on defense expenses, so counsel could keep most of the flat fee the county had paid him.[1]

But this potential conflict of interest does not, by itself, "support an 'informed speculation' that . . . [it] impaired the defendant's right to effective assistance of counsel" (*People v. Rundle, supra,* 43 Cal.4th at p. 175), because most attorneys abide by their commitment to spend the allocated funds on the defense. Nor is spending only a fraction of the funds on defense expenses in itself a violation of the defendant's right to conflict-free counsel, because tactically reasonable decisions may underlie that decision. For example, at an early stage of the proceedings, before defense counsel has spent the money allocated for investigation and experts, a defendant may be offered a highly favorable plea bargain, which counsel has reason to believe will be withdrawn if not accepted immediately. In that situation, it makes sense for counsel to advise the defendant to accept the offer; if the defendant does so, counsel has no need to spend the money allocated for investigation and experts.

If there is a plausible explanation here for defense counsel's failure to spend the money allocated for investigation and expert testimony, or if it cannot be determined from the record whether counsel's actions were justified, defendant's claim must be rejected on this direct appeal, although he may still have a remedy on habeas corpus. (See p. 461, fn. 2, *post.*) As explained below, the record does not show that counsel's minimal preparation for the *guilt phase* of trial was tactically unjustified, but there is such a showing with regard to the *penalty phase.*

A. *Guilt Phase*

According to defendant, defense investigator Jeff Gunn did only 13.5 hours of guilt phase preparation before counsel announced that the defense was

---

[1] Recently, flat fee contracts of this nature were criticized in a report by the California Commission on the Fair Administration of Justice, a group that was chaired by former Attorney General John Van de Kamp, and whose members included the current Attorney General; the District Attorneys of Santa Clara, San Mateo, and Ventura Counties; several law enforcement officers; and members of the criminal defense bar. The report recommended that "legislation be enacted to provide that when Counties contract for indigent defense services in criminal cases, the contract shall provide separate funding for . . . investigators and expert witnesses." (Cal. Com. on Fair Admin. of Justice, Final Rep. (2008) Professional Responsibility and Accountability of Prosecutors and Defense Lawyers, Rep. on Funding of Defense Services in Cal., p. 13.)

In light of the above-mentioned problems associated with this type of fee agreement, this court should exercise its supervisory powers to prospectively declare fee agreements of this type invalid. (See generally *People v. Barboza* (1981) 29 Cal.3d 375, 381 [173 Cal.Rptr. 458, 627 P.2d 188] [announcing a " 'judicially declared rule of criminal procedure' " invalidating fee agreements between counties and public defender's offices that create a financial incentive for the public defender not to declare a conflict of interest].)

ready for trial. But, as the majority points out, investigator Gunn "had originally worked on this case for about two and one-half months as the investigator for the Fresno County Public Defender and had conducted approximately 90 hours of investigation before the public defender declared a conflict." (Maj. opn., *ante*, at p. 422.)

Defendant complains that his counsel did not hire a ballistics expert until shortly before commencement of the guilt phase. But the fee agreement's built-in financial incentive for defense counsel *not to hire* experts provided no incentive for counsel to *delay* the retention of experts.

Defendant criticizes his counsel for not hiring an expert to perform a blood analysis or to perform a tire tread analysis. But the evidence presented at trial does not show that a blood analysis was significant to the question of guilt.

Defendant faults his counsel for not conducting DNA testing of evidence obtained from victim Espinoza's body. But even if that evidence had not contained defendant's DNA, defendant would not have been exculpated, because Espinoza was a prostitute and was thus likely to have had sex with other men. Also, counsel may have chosen to rush this case to trial in the expectation that the trial would occur before the prosecution's completion of its own DNA testing; if so, counsel can hardly be faulted for not having any DNA testing done himself.

Because the record on this appeal does not show whether defense counsel's preparations for the guilt phase were unreasonable, there can be no "informed speculation" (*People v. Rundle, supra*, 43 Cal.4th at p. 175) that the representation at the guilt phase violated defendant's right to conflict-free counsel.[2] Not so with respect to the penalty phase, however.

## B. *Penalty Phase*

With respect to certain aspects of penalty phase preparation—the hiring of potential expert witnesses and the investigation of potential defense witnesses—counsel here shortchanged defendant by not using the allocated money in a reasonably competent manner.

---

[2] Rejection of such a claim on direct appeal does not foreclose defendant from making a more persuasive showing on habeas corpus, based on matters outside the appellate record. Such a showing may well be possible: Defendant's habeas corpus petition (pending in this court), alleges that while representing defendant, counsel incurred huge gambling debts; that to pay those debts, counsel borrowed money without intending to repay it, which led the State Bar in 2001 to temporarily suspend his right to practice law; and that in 2004 he resigned from the State Bar with additional charges pending. But these matters are not fully included in the appellate record and therefore may not be considered on this direct appeal.

Before trial, counsel budgeted $15,000 for "Background (lifetime) investigation of Defendant for penalty phase social study report" and $10,000 for a "Psychiatrist and Social Worker." Instead, he paid a total of $4,500 for a defense psychiatrist (who testified at the guilt phase) and a psychologist (who testified at the penalty phase), and he spent no money on preparation of a social study report. There is no legitimate tactical justification for not having such a report done.

Counsel also failed to conduct an adequate investigation of potential character witnesses who could have testified on defendant's behalf at the penalty phase. At a hearing on a defense motion for a continuance, held three days before the penalty phase was scheduled to begin, counsel told the trial court that defendant had given him a list of 16 potential character witnesses but that he had not contacted any of them. None of them testified at the penalty phase of trial, where the only defense witness was a psychologist. Counsel made the self-serving claim that he deliberately did not interview these witnesses so he could avoid furnishing the prosecution with witness discovery. But this is not a legitimate tactical justification—to determine whether these potential witnesses would be helpful to the defense, they needed to be interviewed, a task that a reasonably competent attorney would ordinarily have assigned to a hired investigator.

To prepare for the penalty phase of a death penalty trial, defense counsel must "conduct a thorough investigation of the defendant's background." (*Williams v. Taylor* (2000) 529 U.S. 362, 396 [146 L.Ed.2d 389, 120 S.Ct. 1495].) "[I]nvestigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" (*Wiggins v. Smith* (2003) 539 U.S. 510, 524 [156 L.Ed.2d 471, 123 S.Ct. 2527].) Here, as discussed earlier, defense counsel's investigation and preparation for the penalty phase of trial was virtually nonexistent, and he spent only a fraction of the funds Fresno County had allocated for the defense. This circumstance supports an "informed speculation" (*People v. Rundle, supra,* 43 Cal.4th at p. 175) that the defense has been compromised by the attorney's conduct, resulting in a violation of defendant's right under the California Constitution to be represented by an attorney unencumbered by a conflict of interest.

Does this violation require reversal of the sentence of death? As explained below, that question is not an easy one to resolve because case law provides no definitive answer on the test to be applied.

## III

To determine in a particular case whether the right to conflict-free counsel requires reversal under either the state or the federal Constitution, this court has long relied on the high court's decision in *Cuyler v. Sullivan* (1980) 446 U.S. 335 [64 L.Ed.2d 333, 100 S.Ct. 1708] *(Sullivan)*. That case held that when a conflict of interest adversely affects defense counsel's representation, reversal is required without an evaluation of whether the result of trial would have been different had there been no conflict. Put differently, there is a presumption of prejudice. (See *Strickland v. Washington* (1984) 466 U.S. 668, 692 [80 L.Ed.2d 674, 104 S.Ct. 2052] [*Sullivan* "held that prejudice is presumed when counsel is burdened by an actual conflict of interest"].)

We explained in *People v. Easley* (1988) 46 Cal.3d 712, 725 [250 Cal.Rptr. 855, 759 P.2d 490]: "It is important to recognize that 'adverse effect on counsel's performance' under *Sullivan* . . . is not the same as 'prejudice' in the sense in which we often use that term. When, for example, we review a 'traditional' claim of ineffective assistance of counsel (i.e., one involving asserted inadequate performance as opposed to 'conflicted' performance), we require the defendant to show a reasonable probability that the *result . . .* would have been different. [Citations.] This, however, is not the inquiry called for under *Sullivan*." Instead, reversal is required when "counsel 'pulled his punches,' i.e., failed to represent the defendant as vigorously as he might have had there been no conflict." *(Ibid.;* see also *People v. Mroczko* (1983) 35 Cal.3d 86, 104, fn. 16 [197 Cal.Rptr. 52, 672 P.2d 835] ["the Supreme Court's formulation seems to envision an analysis of whether there has been some identifiable prejudice to the right of effective representation, but not an analysis of whether that prejudice affected the outcome of the case"]; *Maxwell v. Superior Court, supra,* 30 Cal.3d at p. 612 ["When a conviction is attacked validly on the ground that an appointed lawyer was influenced by conflict of interest the appellate court may not ' "indulge in nice calculations as to the amount of [resulting] prejudice . . . ." ' "].)

In *Sullivan,* the alleged conflict of interest arose from defense counsel's multiple concurrent representation; that is, counsel simultaneously represented more than one client. *(Sullivan, supra,* 446 U.S. at pp. 337–339.) Rather recently, the United States Supreme Court noted in *Mickens v. Taylor* (2002) 535 U.S. 162, 174 [152 L.Ed.2d 291, 122 S.Ct. 1237] *(Mickens)*, that several federal circuit courts have applied *Sullivan's* presumption of prejudice standard in cases in which a defense attorney's representation implicated "counsel's personal or financial interests." But, *Mickens* pointed out, "the language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application." *(Id.* at p. 175.) *Mickens* concluded that "[w]hether *Sullivan* should be extended to such cases remains, as far as the

jurisprudence of this Court is concerned, an open question" (*id.* at p. 176), one that it did not resolve in that case.

Thus, it is not clear what test of prejudice to apply where, as here, the defense attorney's professional duty to competently represent the client collides with the attorney's personal or financial interests. I note that after the high court's decision in *Mickens, supra,* 535 U.S. 162, this court in *People v. Rundle, supra,* 43 Cal.4th at pages 168–176, did not apply *Sullivan*'s presumption of prejudice standard. In *Rundle,* the attorney's narrow conflict of interest pertained only to an allegation of jury misconduct, not to any other aspect of the case. Here, by contrast, defense counsel's conflict of interest adversely affected the entire penalty phase, and it was the government (Fresno County) that, through its fee agreement, created the conflict.

The nature of the fee agreement was such that the less money counsel spent on the defense, the more money he could pocket for himself, thus creating a strong financial incentive to enrich himself at the expense of the defense. Because it was the government's fee agreement that made this possible, I would apply the standard of presumed prejudice that the high court established in *Sullivan, supra,* 446 U.S. 335. And I would conclude, based on an "informed speculation" (*People v. Rundle, supra,* 43 Cal.4th at p. 175) supported by the record, that Fresno County's fee agreement with counsel did adversely affect his representation at the penalty phase of trial, thus requiring reversal of the judgment of death.

## IV

I question the soundness of the majority's reasoning in rejecting defendant's conflict of interest claim.

Disapproving decades of this court's case law, the majority blithely discards a well-established rule, which goes back some 40 years, that a criminal defendant need only show "that the record support an 'informed speculation' that a 'potential conflict of interest' impaired the defendant's right to effective assistance of counsel." (*People v. Rundle, supra,* 43 Cal.4th at p. 175; see, e.g., *People v. Frye* (1998) 18 Cal.4th 894, 998 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Mroczko, supra,* 35 Cal.3d at p. 105; *People v. Cook* (1975) 13 Cal.3d 663, 670 [119 Cal.Rptr. 500, 532 P.2d 148]; *People v. Chacon* (1968) 69 Cal.2d 765, 776, fn. 2 [73 Cal.Rptr. 10, 447 P.2d 106].) The majority's conclusory explanation is that "a precise definition of our informed speculation concept has proven elusive and the concept has been somewhat variously applied" (maj. opn., *ante,* at p. 419), and that the standard "is too amorphous to provide meaningful guidance to either the bench or bar" (*id.* at p. 421). How so? The majority does not say. It simply

cites six decisions of this court, each containing in brackets a quoted sentence fragment describing, each in a slightly different manner, the informed speculation standard. (Maj. opn., *ante*, at pp. 419–420.) But those quoted sentence fragments offer no insight into the majority's reasons for tossing the informed speculation standard on the rubbish heap of discarded legal principles.

This court does not lightly cast aside established principles of law. When it does, it is generally because the old standard has proven unworkable or inequitable, or because it has led to inconsistent results. (See, e.g., *In re Lawrence* (2008) 44 Cal.4th 1181, 1218, 1220 [82 Cal.Rptr.3d 169, 190 P.3d 535] [abandoning the "minimum elements inquiry" for appellate review of parole decisions because it proved to be "unworkable in practice" and "substantially undermine[d] the rehabilitative goals of the governing statutes"].) Here, the majority makes no attempt to show that the informed speculation standard is unworkable in practice or that it has led to inconsistent results.

The prejudice standard the majority prefers, and adopts, for cases (like this one) in which the conflict of interest does not stem from an attorney's concurrent representation, is the one that the high court established in *Strickland v. Washington, supra*, 466 U.S. 668 (*Strickland*), a case involving incompetent representation. The inquiry under that test is whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) Applying that test here, and assuming for the sake of argument that Fresno County's fee agreement with defense counsel gave rise to a conflict of interest, the majority concludes that any violation of defendant's right to counsel arising from that conflict was harmless. (Maj. opn., *ante*, at pp. 429–430.)

Application of the *Strickland* test would indeed lead to the majority's conclusion, for defendant has not shown that he suffered any prejudice from the violation of his right to counsel. This is why: The record does not show what mitigating evidence would have been offered had defendant been represented by an attorney unencumbered by the conflict of interest at issue here.

But, for reasons discussed earlier (see *ante*, pp. 463–464), that is not the test I would use here. Because it was the government (Fresno County) that, through the particular fee agreement it had with defense counsel, created the conflict of interest, I would apply the presumption of prejudice standard that the high court established in *Sullivan, supra*, 446 U.S. 335.

## CONCLUSION

For the reasons given above, I would reverse the judgment of death.

Werdegar, J., concurred.

Appellant's petition for a rehearing was denied March 25, 2009. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.